# COVER SHEET

U.S. ... COURT
DISTRICT OF NEW JERSEY
RECEIVED

2025 SEP 16 P 11: 1_

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW JERSEY**

**AZAD ALAMGIR KABIR,**
Plaintiff,

v.

**WEBMD LLC, and THOUGHTi, INC.,**
Defendants.

Civil Action No. 2:25-cv-15207

**PLAINTIFF'S CROSS-MOTION TO DENY SEALING OF THE DECLARATION OF ABDALLAH ABUHUSSEIN**

**(Filed Under Seal – Unredacted Version)**

**Dear Clerk of the Court,**

I previously mailed this set of documents, but I have not seen them uploaded to the CM/ECF docket. Since new evidence has become available, I am resubmitting the motion with minor revisions, including the addition of new exhibits and the removal of certain prior exhibits, to ensure the updated materials are properly filed and not misplaced.

Thank you for your assistance and understanding.

Respectfully,

/s/ Azad Kabir

**Dr. Azad Kabir, Pro Se**
1120 Beach Blvd
Biloxi, MS 39530
Email: azad.kabir@ddxrx.net
Tel: (228) 342-6278

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW JERSEY**

U.S.D ... COURT
DISTRICT OF NEW JERSEY
RECEIVED

2025 SEP 16  P 11: 1⁓

Azad Alamgir Kabir,

Plaintiff,

v.

WebMD LLC, Thoughti, Inc., and John Doe 1 (OpenAI, Inc.),

Defendants.

Civil Action No.: 2:25-cv-15207

**PLAINTIFF'S NOTICE OF REVISION TO CROSS-MOTION TO DENY SEALING OF THE**

**DECLARATION OF ABDALLAH ABUHUSSEIN**

1. Plaintiff, pro se, respectfully notifies the Court and all parties of the following
   revisions to the previously filed **Plaintiff's Cross-Motion to Deny Sealing of the
   Declaration of Abdallah Abuhussein**:

2. **Removal and Replacement of Section (2 h):**

   a) Plaintiff has removed the section originally designated as subsection **(h)**

      **Athenahealth's diagnostic API**, which stated: *"Moreover, Plaintiff*

      *respectfully opposes Defendants' attempts to file evidence under seal that*

      *relates to WebMD's symptom checker and its reliance on Athenahealth's*

      *diagnostic API. As demonstrated in Exhibit A (Athena Patent Infringement*

*Preliminary Evidence) and the accompanying Declaration of Dr. Azad Kabir (Exhibit 41), this information was obtained exclusively through publicly available tools — namely, the browser 'Inspect' feature — and does not contain any confidential or proprietary discovery materials."*

b) In place of subsection (h), Plaintiff has inserted a new section, which is shown below: **"Sealed Information Publicly Available: Exhibit 44**, which demonstrates that **OpenAI's API is functioning as a backend for generating ranked differential diagnoses** in WebMD's accused system. The mention of "Athena condition" within the observed API payload raises suspicion regarding possible involvement of Athenahealth, Inc. Plaintiff reserves the right to seek leave to add Athenahealth as a defendant if discovery substantiates their participation. This information was obtained exclusively through publicly available tools — namely, the browser 'Inspect' feature — and does not contain any confidential or proprietary discovery materials."

3. **Correction to Section (6 a):**

a) The prior version of Section (a) stated: *"Exhibit A, Exhibit 41, and Exhibit 43 demonstrate — through screenshots — that the WebMD symptom checker transmits and receives data via API calls that can be readily observed using the 'Inspect' tool built into any modern browser. Figures 1–6 show how WebMD's system calls Athenahealth's backend, returning rank-ordered differential diagnoses consistent with Plaintiff's patented method."*

b) The corrected version now states: *"Exhibit 43 and Exhibit 44 demonstrate —
through screenshots — that the WebMD symptom checker transmits and
receives data via API calls that can be readily observed using the 'Inspect'
tool built into any modern browser."*

c) The sentence beginning "Figures 1–6 show..." has been **removed**.

4. Plaintiff has revised **Conclusion Section 10** by removing references to an
*Athenahealth API connection* and substituting evidence of *OpenAI API connections*
as reflected in the updated Exhibit materials.

5. This substitution is made to provide the Court with the most accurate and relevant
evidence in support of Plaintiff's position opposing sealing of the Abuhussein
declaration.

**Respectfully submitted,**

**Dated: September 12, 2025**

**/s/ Azad Kabir**

Dr. Azad Kabir, MD

Pro Se Plaintiff

1120 Beach Blvd

Biloxi, MS 39530

Email: azad.kabir@ddxrx.net

Tel: (228) 342-6278

---

**CERTIFICATE OF SERVICE**

I hereby certify that on September 12, 2025, I electronically filed the foregoing *Plaintiff's Cross-Motion Opposing Defendants' Motion to Seal* with the Clerk of Court by mail, and also emailed a copy to counsel of record. Additionally, the CM/ECF system will automatically send notice of such filing to all counsel of record and registered participants in this case.

Respectfully submitted,

/s/ Azad Kabir
**Dr. Azad Kabir, Pro Se**

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

AZAD ALAMGIR KABIR,

Plaintiff,

v.

WEBMD LLC, and THOUGHTi, INC.,

Defendants.

Civil Action No. 2:25-cv-15207

---

**PLAINTIFF'S CROSS-MOTION TO DENY SEALING OF THE DECLARATION OF ABDALLAH ABUHUSSEIN**

**(Filed Under Seal – Unredacted Version)**

1. Plaintiff respectfully submits the following exhibits and attachments in support of his

   **Memorandum of Law in Opposition to Defendants' Motion to File Under Seal**. Each

   exhibit is provided in its complete, unredacted form for the Court's review. A

   redacted/public-facing version of the memorandum has also been filed

   contemporaneously on the docket.

**I. INTRODUCTION**

1

2. Plaintiff respectfully opposes Defendants' attempt to seal the Declaration of Abdallah Abuhussein and moves for an order denying sealing.

  a) **Points 1–5 (General Information Already Public).** The first five points of the declaration contain only benign and general information. Nothing in these sections could jeopardize Defendants' business interests. Indeed, Mr. Abuhussein himself publicly disclosed substantially the same information on LinkedIn (**Exhibit 43**). Sealing is therefore unnecessary and contrary to the strong presumption of public access.

  b) **Point 6 (Public Information; Admission of Infringement).** Point 6 likewise contains information already in the public domain. Moreover, Defendants' statement constitutes an admission that they knowingly infringe Plaintiff's patents as of the date of the declaration. This is not a trade secret but a judicially relevant fact that must remain accessible.

  c) **Point 7 (Business Model Already Public).** The description of Defendants' business model is already disclosed in **Exhibit 25 (slides 6 and 8)**. Because this information is public, sealing serves no legitimate purpose under Local Civil Rule 5.3.

  d) **Points 8–10 (Denial of Maintaining Medical Data Tables).** In these paragraphs, Defendants assert that they do not maintain tables of medical data. This is a factual claim that will require forensic analysis of Defendants' servers. Publicly available evidence, including **Exhibit 44**, shows Defendants' system uses APIs capable of drawing data from servers other than their own. While the source servers are geo-

2

blocked through Cloudflare, this is a technical issue for discovery, not a basis for sealing. **Point 9, as reflected in the case timeline already submitted by Plaintiff, has likewise been disclosed through documentary evidence and is not confidential.** Collectively, these paragraphs contain no proprietary code, algorithmic detail, or sensitive commercial secret.

e) **Point 11 (Connection with Thoughti Personnel).** Defendants state that they have no connection with Thoughti personnel. This assertion requires verification during discovery from both WebMD and Thoughti. The only potential harm from disclosure is reputational: if WebMD has misinformed the Court, that fact would damage its credibility as a healthcare business that relies on public trust. Such reputational harm is not a cognizable injury under Local Civil Rule 5.3 and does not outweigh the public interest in transparency.

f) **Missing Third-Party Disclosure (Thoughti, Inc. Connection).** The only potentially relevant information in Mr. Abuhussein's declaration would have been disclosure of the name of any third party connecting Thoughti, Inc. with WebMD, which would allow Plaintiff to investigate further and seek discovery from Defendants. That disclosure is conspicuously absent. This omission appears to be a bad-faith tactic to conceal critical information central to the trade secret claims. Without naming third parties, the declaration has no legitimate reason to be treated as confidential or filed under seal, and its sealing serves only to frustrate Plaintiff's ability to pursue full discovery.

3

g) **Improper Use of Sealing.** Nothing in the declaration constitutes a business secret or confidential technical information. Instead, sealing would increase the burden on Plaintiff and the Court by forcing unnecessary sealed filings and preventing Plaintiff from citing this evidence in public filings. The effort to seal appears to be a ploy to obscure relevant evidence from the Department of Justice and to avoid public scrutiny—an improper use of the sealing process made in bad faith.

h) **Sealed Information Publicly Available: Exhibit 44**, which demonstrates that **OpenAI's API is functioning as a backend for generating ranked differential diagnoses** in WebMD's accused system. The mention of "Athena condition" within the observed API payload raises suspicion regarding possible involvement of Athenahealth, Inc. Plaintiff reserves the right to seek leave to add Athenahealth as a defendant if discovery substantiates their participation. This information was obtained exclusively through publicly available tools — namely, the browser 'Inspect' feature — and does not contain any confidential or proprietary discovery materials.

i) Because the data at issue is already in the **public domain** and accessible to any internet user, it cannot properly be sealed under governing law. Courts in this District and across the country consistently hold that materials subject to sealing must involve **genuinely confidential business information** that is not publicly available. Defendants' effort to cloak ordinary browser-observable information under the guise of confidentiality constitutes an improper use of sealing procedures and should be denied.

4

## II. LEGAL STANDARD

3. A party seeking to seal documents in the District of New Jersey bears a **heavy burden**.

   Local Civil Rule 5.3(c)(2) requires the movant to demonstrate:

   a) The nature of the materials or proceedings at issue;

   b) The legitimate private or public interests warranting the relief sought;

   c) The clearly defined and serious injury that would result if the relief is not granted; and

   d) Why is no less restrictive alternative available?

4. See *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (sealing is only appropriate when disclosure would cause a "clearly defined and serious injury" to the party seeking protection).

5. Moreover, the presumption of public access to judicial records is "firmly rooted in our nation's history." *In re Avandia Mktg.*, Sales Practices & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019). The burden rests squarely on the party seeking secrecy to show that sealing is warranted.

## III. ARGUMENT

6. **The Information is Publicly Available Through WebMD's Own Website:**

5

a) Exhibit 43 and Exhibit 44 demonstrate — through screenshots — that the WebMD symptom checker transmits and receives data via API calls that can be readily observed using the "Inspect" tool built into any modern browser.

b) Because this information is **visible to any member of the public** with ordinary technical skills, it cannot be considered confidential. Courts routinely deny sealing requests where the material is already accessible through public means. See *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 165 (3d Cir. 1993) ("Information that is publicly available cannot be confidential.").

7. **Defendants' Attempt to Seal Public Material Is an Improper Use of Rule 26(c)**

a) Protective orders and sealing exist to shield bona fide trade secrets or sensitive commercial data. They cannot be used to suppress facts already disclosed to the public. See *Littlejohn v. BIC Corp.*, 851 F.2d 673, 685 (3d Cir. 1988) (noting that courts should not seal records absent compelling justification).

b) Here, WebMD seeks to retroactively classify as confidential data that any web user can replicate. This misuse of sealing undermines both the **public's right of access** and Plaintiff's ability to fairly present evidence of infringement.

8. **Plaintiff Would Be Prejudiced by Improper Sealing:** If WebMD succeeds in cloaking this evidence, Plaintiff will be unable to rely openly on the very data that proves infringement of his patent. Meanwhile, Defendants will continue to publicly operate a system whose API calls are observable worldwide. The asymmetry is both unfair and contrary to the spirit of open judicial proceedings.

9. **Sealing Would Hinder Parallel DOJ Oversight and Perpetuate Misconduct**

6

a) Plaintiff is under significant hardship in fulfilling his duty to provide information to the U.S. Department of Justice (DOJ) and other regulators regarding potential antitrust violations, collusion, and trade secret misappropriation by large corporations. The sealing of evidence that is already publicly observable would obstruct Plaintiff's ability to cooperate with federal authorities and thereby frustrate the broader public interest in investigating misconduct.

b) Defendants' attempt to shield material from public scrutiny appears designed not only to gain litigation advantage, but also to **forestall DOJ oversight** and allow ongoing patent infringement and trade secret misappropriation to continue unchecked. Courts have repeatedly recognized that protective orders and sealing cannot be used to conceal evidence of potential unlawful conduct from regulators or the public. See *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 788 (3d Cir. 1994) (public interest in disclosure is "particularly compelling" where documents may shed light on matters of public concern).

c) If Defendants succeed in cloaking this evidence, Plaintiff will face increased hardship in providing regulators with critical information necessary for a fair investigation. At the same time, Defendants would gain an unwarranted shield to continue their unlawful use of Plaintiff's patented technology and trade secrets. This outcome would undermine both the administration of justice in this Court and the enforcement prerogatives of federal authorities.

**10. CONCLUSION:** Because the Declaration of Abdallah Abuhussein contains no confidential business information, no protectable trade secrets, and no material that would cause a clearly defined and serious injury if disclosed, Defendants' motion does not satisfy the requirements of Local Civil Rule 5.3(c)(2). Defendants' sealing request instead appears to be a bad-faith attempt to create needless hurdles for a pro se Plaintiff, to obscure matters of public concern such as WebMD's symptom checker and **OpenAI API connections**, and to obstruct the Department of Justice from reviewing relevant evidence, as Defendants have already asserted. Plaintiff respectfully requests that the Court deny Defendants' motion to seal and direct that the declaration remain part of the public record.

Respectfully submitted,

**Dated: September 12, 2025**

/s/ Azad Kabir
Dr. Azad Kabir, MD
Pro Se Plaintiff
1120 Beach Blvd
Biloxi, MS 39530
Email: azad.kabir@ddxrx.net
Tel: (228) 342-6278

**EXHIBITS AND ATTACHMENTS LIST**

**Exhibits**

1. **Exhibit 25 (slides 6 and 8) -** The description of Defendants' business model is already disclosed

8

2. **Exhibit 43** – Mr. Abuhussein himself publicly disclosed substantially the same information on LinkedIn.

3. **Exhibit 44** – - WebMD API JSON Payload Showing Open AI Model.

4. **Exhibit B** – Defense Email Stating Protective Order Prohibits Disclosure

5. **Document 42 –** Analysis of Defendants' under seal (submitted to the Georgia court) document showing self-incrimination.

6. **Opp. Ex. B –** Mr. Abuhussein Declaration (Currently Sealed): Plaintiff moves to have this declaration unsealed.

**Attachments**

- **Attachment 1** – Plaintiff's Public-Facing Summary Opposition (Redacted Version filed on the docket).

**CERTIFICATE OF SERVICE**

I hereby certify that on September 12, 2025, I electronically filed the foregoing *Plaintiff's Cross-Motion Opposing Defendants' Motion to Seal* with the Clerk of Court by mail, and also emailed a copy to counsel of record. Additionally, the CM/ECF system will automatically send notice of such filing to all counsel of record and registered participants in this case.

Respectfully submitted,

/s/ Azad Kabir

**Dr. Azad Kabir, Pro Se**

9

## EXHIBIT - B

## Kabir v WebMD - Response to emails

**From** Zeller, Steven <SZeller@dykema.com>
**To** Azad Kabir, MD MSPH <azad.kabir@ddxrx.net>
**Cc** Adams, Michael <MAdams@dykema.com>, Jeff Starr <jeff.starr@colemantalley.com>
**Date** 2025-08-26 15:23

Dr. Kabir,

You have sent several emails over the last few days and I'm going to respond to them in one here.

### Leave to file oversized brief

WebMD will not oppose your motion, so you may file it as "Unopposed," not as "consented." Even as a pro se party, you are expected to follow the Federal Rules of Civil Procedure and the Local Rules of the court. We understand the occasional need to exceed page limits and extend deadlines, and will almost always accommodate reasonable requests to do so. We do expect, however, that such requests be made _before_ filing or _before_ missing a deadline.

### Protective Order Issues

RE:  Clarification on Submitting Protected Evidence (Under Seal) to DOJ [email of 8/23/25]
Subject: Request to Stipulate to Amendment No. 1 to Protective Order (Government-Referral Carve-Out) [email of 8/23/25]
Subject: Motion re: Proposed Protective Order, Regulator Carve-Out & Public/Independent Information [email of 8/24/25]
Subject: Proposed Exhibit B for Revised Protective Order — Joint Stipulation [email of 8/25/25]

You have filed a motion with the Court entitled "Plaintiff's Motion to Withhold Entry of Proposed Stipulated Protective Order", which moots many of the issues that you raised in these emails. WebMD will present its positions in response to the motion. There are a few points I do want to address, however.

First, despite your claim that you were pressed for time and did not fully review the proposed protective order, you proposed the addition of provisions for a two-tier level of confidentiality, expert disclosure requirements, a non-use clause, 3rd party subpoena protection and a clarification to the survivability provision. These are all sophisticated additions and indicate that a thorough review of the proposed order occurred.

Second, WebMD does not agree that you may disclose any of WebMD's information designated as "Confidential" and filed under seal with the Court, to anyone beyond that permitted in the stipulated Protective Order. That includes the DOJ or any other 3rd party. I remind you that you specifically proposed, and I included into the agreement, the clause that strengthened the non-use provision.

All Confidential and AEO Information shall be used **solely for purposes of this litigation** and shall not be used for any business, commercial, competitive, or personal purpose, even after final disposition of this case.

That provision does not provide any room for the sharing that you have requested. Furthermore, WebMD does not agree to any modifications to the current Protective Order to allow unfettered disclosure of confidential information to anyone. The current order specifically does not limit a party to seek the Court's permission to disclose to third parties, and we believe that is the proper way to seek relief from the order. We therefore do not see a need to meet and confer on the issue, especially as you have already filed a motion with the court that covers most of the same issues.

### Request to Confer re Joint Stipulation (Preservation/Forensic Protocol & Expedited Discovery). [email of 8/25/25]

WebMD does not agree to any of your proposals contained in this email. You filed a motion for preliminary injunction, for which briefing is now complete. It is appropriate now to allow the Court to rule on the motion, and determine what relief, _if any_, you may be entitled to at this stage. Accordingly, we do not see the need to meet & confer on these topics.

If I have not addressed any of your specific questions, please let me know and I will reply promptly.

Regards,

Steve Zeller

**Steven McMahon Zeller**
Member

D 312-627-2272 · M 708-587-6963

SZeller@dykema.com · dykema.com

BIO   VCARD   LINKEDIN

10 South Wacker Drive, Suite 2300
Chicago, Illinois 60606

# Dykema

*** Notice from Dykema Gossett PLLC: This Internet message may contain information that is privileged, confidential, and exempt from disclosure. It is intended for use only by the person to whom it is addressed. If you have received this in error, please (1) do not forward or use this information in any way; and (2) contact me immediately.

Neither this information block, the typed name of the sender, nor anything else in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message.

Exhibit 44: API Output Suggesting Combined Use of WebMD Frontend and Possible Open Ai Backend Diagnostic Logic

**Figure 1: WebMD API JSON Payload Showing Patent-Infringing Ranked Differential Logic Delivered by Open AI**



1. **Figure 1** reproduces a JSON-formatted API response from the publicly accessible symptoms.webmd.com website, captured via standard browser inspection tools. It demonstrates that WebMD's backend system performs ranked differential diagnosis based on user-submitted symptoms — in this example, **chest pain, shortness of breath, and palpitations** (as entered for a 71-year-old male user).

2. The payload includes:

   a) **Score values** for each condition (e.g., 0.9 for *Acute Myocardial Infarction*, 0.85 for *Congestive Heart Failure*, 0.8 for *Pulmonary Embolism*), reflecting strength-of-match calculations;

   b) A **tiered match label system** (e.g., "High Match", "Moderate Match", etc.) corresponding to these scores;

   c) Arrays of **condition synonyms** (e.g., "heart attack", "myocardial infarction"), **urgency flags**, and **severity indicators**;

1

**Exhibit 44: API Output Suggesting Combined Use of WebMD Frontend and Possible Open Ai Backend Diagnostic Logic**

d) Structured **internal mapping objects** including webmd_condition_id, mapping.url, and condition_arr fields linking to specific WebMD condition pages.

e) A declared **model origin**: "model": **"saas-openai-gpt-4o-mini"** along with function call "prompt_func_name": "conditions_renderer_v2" — indicating that while LLM-based components may assist in text rendering or template generation, the structured scoring logic derives from non-LLM backend processes with deterministic symptom-matching behavior.

2. This API response constitutes **direct technical evidence** that WebMD is not merely generating natural language responses, but is **performing structured differential diagnosis** with explicit strength-of-match scoring — a process squarely within the scope of Plaintiff's patented claims, including:

a) **Claim 1, 9 or Claim 12**: Matching user symptoms against a symptom-to-disease mapping, and weight-based ranking to reduce diagnostic uncertainty;

b) **Claim 2, 10 or Claim 13**: Dynamically generating and displaying a ranked differential diagnosis list based on disease prevalence.

3. Because this JSON is produced **in real-time** as part of a live user session and corroborated by visual frontend alignment (e.g., ranked conditions in the left panel), it constitutes **forensic-quality evidence** of WebMD's use of Plaintiff's patented triage logic. Any use of OpenAI, Thoughti, Athenahealth or other service providers to deploy this logic would support theories of **direct**, **induced**, and/or **contributory** infringement.

**Table 1: Non-Infringing Alternatives vs. Functionality Matching Limitations Recited in Claims 1, 2, 9, 10, 12, 13 (Diagnostic Logic Systems)**

| Feature / Behavior | Non-Infringing Alternative | Functionality Matching Limitations Recited in Claims 1, 2, 9, 10, 12, 13 |
|---|---|---|
| **Diagnosis Suggestions** | Displays unranked list of possible diagnoses (e.g., "you might have X, Y, or Z") | Displays a **rank-ordered list** of possible conditions based on input symptoms |

2

**Exhibit 44: API Output Suggesting Combined Use of WebMD Frontend and Possible Open Ai Backend Diagnostic Logic**

| | | |
|---|---|---|
| **Numerical Scores** | No scores shown or generated | Each diagnosis has a **score** (e.g., 0.9 for Pneumonia, 0.8 for Bronchitis), indicating **strength of match** |
| **Symptom-to-Disease Mapping** | Hardcoded text responses or generic advice | Uses a **structured mapping** to match symptoms to diseases (Claim 9) |
| **Weighted Scoring System** | Equal weight given to all symptoms, or no weighting at all | Diseases linked to each symptoms have **different weights** (based on ranking on the list) which depends on their prevalence (Claim 10 or 13) |
| **Ranking Logic** | No computation of rank; suggestions appear static regardless of symptom combination | System **re-ranks** diseases dynamically depending on the set of symptoms entered (Claim 12) |
| **Backend Algorithm / Model Function** | Uses pre-written paragraphs or rule-based logic only | Backend includes a **custom model function** (e.g., conditions_renderer_v2) with logic to transform inputs into ranked outputs |
| **LLM Use Only (e.g., GPT-4o-mini)** | Uses LLM to generate prose explanations or suggest related content | LLM is **not the source of scores**; instead, LLM is wrapped around or used alongside structured scoring logic (possibly infringing logic) |
| **Scoring Based on Medical Probability** | No explicit mention of diagnostic likelihood | System assigns scores that **track clinical probability** and adjusts them based on symptom prevalence or urgency |
| **Condition Synonyms & Urgency Mapping** | Textual synonym lists provided without logic integration | Synonyms + **urgency flags + WebMD ID mapping** used to build logic-enhanced output |
| **Response to New Symptoms** | New symptom entry does **not change diagnosis order** | New symptom entry **dynamically alters scores and ranking**, confirming use of symptom-to-disease matrix |

3

Exhibit 44: API Output Suggesting Combined Use of WebMD Frontend and Possible Open Ai Backend Diagnostic Logic

4. Any diagnostic system that performs **score-based ranking of diseases in response to user symptoms**, especially using backend logic like conditions_renderer_v2, **is functionally executing the key claims of the Kabir patent**—even if it is wrapped in an LLM interface or uses different terminology.

**5. How LLMs (ChatGPT) Approximate Clinical Reasoning**

LLMs like ChatGPT are trained in vast corpora of unstructured text, including medical textbooks, guidelines, and clinical narratives. They can:

a) Recall disease associations based on co-occurrence in training data

b) Prioritize life-threatening diagnoses due to frequency of their mention

c) Mimic ranking logic based on commonly taught clinical heuristics

d) Mimics via token probability, but lacks structured computation

4. However, these outputs are generated via token prediction, not cognitive reasoning. LLMs **do not isolate** overlapping diseases from multiple symptom lists, **do not apply frequency-weighted algorithms**, and **do not access a structured differential database.**

- **5. Table 2: Limitations of ChatGPT's in Clinical Diagnosis:** ChatGPT fails to isolate shared diagnoses between "chest pain" and "shortness of breath"

| Functionality | LLMs (e.g., ChatGPT-4) | Kabir Diagnostic Model |
|---|---|---|
| **Uses structured symptom-disease tables** | ❌ No | ✅ Yes |
| **Intersects diagnoses from multiple symptoms** | ❌ No | ✅ Yes |
| **Ranks diseases by frequency or weight** | ❌ No | ✅ Yes |
| **Transparent and reproducible** | ❌ No | ✅ Yes |
| **Handles rare combinations of symptoms** | ❌ Stochastically | ✅ Systematically |
| **Can justify rankings with data** | ❌ No (black box) | ✅ Yes |

**6. Key Innovations of the Kabir Model**

4

**Exhibit 44: API Output Suggesting Combined Use of WebMD Frontend and Possible Open Ai Backend Diagnostic Logic**

    a) **Independent Matching**: Each symptom is independently mapped to a differential diagnosis table.

    b) **Intersection Logic**: The system isolates diseases common to all symptom lists.

    c) **Weighted Ranking**: Diseases are ranked first by number of matching symptoms, then by epidemiological weight (prevalence).

    d) **Transparency**: Every result is auditable and reproducible.

7. **Modularity**: any symptoms can inputs can be comma-delimited or collected through open-ended dialogue and tables can be comma-delimited, it does not avoid infringement. Patent law protects the **underlying method and utility**, not merely the visual representation.

## 7. Evidence of Symptom-to-Disease Mapping & Ranking

### a) API Endpoint Behavior

    I.   The browser is inspecting the WebMD Symptom Checker site: https://symptoms.webmd.com

    II.  The "Preview" pane of the API response includes JSON data such as:

```
"athena_conditions": [

 { "label": "High Match", "score": 0.9, "synonyms": ["heart attack", "myocardial
infarction"] },

 { "label": "High Match", "score": 0.85, "synonyms": ["congestive heart failure"] },

 { "label": "High Match", "score": 0.8, "synonyms": ["pulmonary embolism"] },

 { "label": "Moderate Match", "score": 0.65, "synonyms": ["arrhythmia", "irregular
heartbeat"] },

 { "label": "Moderate Match", "score": 0.55, "synonyms": ["aortic stenosis"] },

 { "label": "Fair Match", "score": 0.4, "synonyms": ["anxiety disorder", "panic
disorder"] },

 { "label": "Fair Match", "score": 0.3, "synonyms": ["pneumonia", "lung infection"] }

]
```

5

**Exhibit 44: API Output Suggesting Combined Use of WebMD Frontend and Possible Open Ai Backend Diagnostic Logic**

**b) Key Observations:** These design features, as implemented in the Kabir patent claims, demonstrate structured computation not found in LLM-based generative models.

I. **Structured Output of Diagnoses:** WebMD outputs a **ranked list** of conditions (e.g., heart attack, CHF, PE) with associated **match scores**, based on user inputs (e.g., *chest pain*, *shortness of breath*, *palpitations* for a 71-year-old male).

II. **Use of Match Scores:** Scores like 0.9, 0.85, 0.8 directly represent a **probabilistic or weighted matching system**, central to Plaintiff's patented methodology:

    a. Score-based ranking (Claim 1, 9, 12)

    b. Prevalence-adjusted weighting (Claim 10, 13)

    c. Diagnostic confidence estimation from symptom overlap (Claim 1, 9, 12)

III. **Synonym Mapping:** Entries such as "heart attack", "myocardial infarction" and "lung infection", "pneumonia" indicate **semantic expansion or NLP preprocessing**.

**c) Use of athena_conditions Key:** The repeated reference to "athena_conditions" implies:

I. Possible use of **Athenahealth's clinical API or terminology mapping layer**, or

II. WebMD's internal structured diagnostic dictionary

8. **Table 3: Patent Mapping (Claim 1, 9 or 12 Analysis)**

| Claim 1, 9, 12 Element | WebMD Behavior Evident? |
|---|---|
| **Collect first and second medical data** | ✅ (User inputs: chest pain, SOB, palpitations) |
| **Access master differential diagnosis table** | ✅ (Indicated by structured athena_conditions) |
| **Map symptoms independently** | ✅ (Multiple symptoms matched to condition set) |

**Exhibit 44: API Output Suggesting Combined Use of WebMD Frontend and Possible Open Ai Backend Diagnostic Logic**

| | |
|---|---|
| **Isolate overlapping disease results** | ✅ (e.g., PE, CHF, MI show multiple symptom overlap) |
| **Generate ranked disease list** | ✅ (Numerical scores: 0.9, 0.85, etc. leads to rank 1, 2, 3, 4 ...) |
| **Rank based on match frequency + diagnostic weight** | ✅ (Score + "match" label logic) |

### 9. Does ChatGPT Know When to Isolate Common Diseases Between Two Symptoms?

No. ChatGPT does not:

- Intersect the disease lists for "chest pain" and "shortness of breath" to isolate overlapping diagnoses
- Apply frequency distributions
- Apply prevalence (epidemiologic distribution) as tie-breakers
- No access to structured differential logic.

**10. Case Law:** Defendants (WebMD, Thoughti, OpenAI, etc.) may argue that AI models just "generate" scores without anyone knowing how. But that's precisely the *problem*: courts have already held in *Aristocrat* and *Abbott* that black-box methods don't meet legal standards for transparency. Explaining this clearly helps cut off evasive defenses and builds a stronger record for discovery and claim construction.

In light of *Aristocrat Technologies* and *Abbott Labs*, Defendants cannot shield their diagnostic engine behind non-specific references to "third party services" without disclosing the precise algorithmic structure by which symptom data is converted into a ranked list of diagnoses. A black-box backend—whether proprietary or licensed—cannot substitute for an intelligible and reproducible method. This principle is critical both to resolving the issue of patent infringement (Claim 1,9, 12) and to ensuring compliance with discovery obligations under Rule 26 and Rule 37.

10. These are **Core features of Kabir model and patent claims**, not present in GPT

### 11. Table 4. Summary Comparison between ChatGPT and Kabir Model

| Feature | ChatGPT 4.0 / 4o | Kabir Diagnostic Model |
|---|---|---|

7

**Exhibit 44: API Output Suggesting Combined Use of WebMD Frontend and Possible Open Ai Backend Diagnostic Logic**

| | | |
|---|---|---|
| Structured symptom-disease mapping | ❌ No | ✅ Yes |
| Isolates common diseases from multiple symptoms | ❌ No | ✅ Yes |
| Frequency-based ranking | ❌ Mimicked via text patterns | ✅ Mathematically defined |
| Transparent, reproducible algorithm | ❌ Opaque (LLM weights) | ✅ Stepwise, auditable |
| Clinical rule-out logic (e.g., "rule out MI first") | ✅ Approximate | ✅ Explicitly prioritized |
| Explainable and programmable | ❌ Not natively | ✅ Designed to be explainable |

12. **UI Alignment (Bottom Left Panel):** The left panel of the webpage displays the **same ranked order and match labels** as the API:

    I.    "Heart Attack (Male) – Strong Match"

    II.   "Congestive Heart Failure – Strong Match"

    III.  "Pulmonary Embolism – Strong Match"

    IV.  This confirms the frontend UI is being **driven by the backend JSON output**, not static content.

13. **STRUCTURE OF THE LLM or GPT Model:** Large language models (LLMs) trying to overcome cognitive computation deficiencies by adapting algorithm used in other areas. These systems leverage delimited or text-based representations of clinical knowledge to bypass structured data requirements. The Kabir patent provided a system for generating high-probability differential diagnoses using a structured table that maps clinical signs, symptoms, and test results to likely diagnoses. There are equivalent protection for representations of that same knowledge structure in **delimited textual formats**, **free text associations**, or **any linearized encoding** that maintains **semantic equivalency**. GPT models contains the  database conversion of tables using following instances.

14. **Table 5: LLM DATABASE CONVERSION**

    Text input to LLM:

**Exhibit 44: API Output Suggesting Combined Use of WebMD Frontend and Possible Open Ai Backend Diagnostic Logic**

"Symptoms: chest pain, dyspnea, orthopnea. Possible diagnoses: CHF, MI, PE. Most common match: CHF."

**Example of Database Conversion**:

**symptom,diagnosis**

chest pain, myocardial infarction

chest pain, pulmonary embolism

chest pain, congestive heart failure

→ Converted to:

"chest pain may be explained by myocardial infarction, pulmonary embolism, or congestive heart failure."

**symptom,diagnosis**

shortness of breath, myocardial infarction

shortness of breath, pulmonary embolism

shortness of breath, congestive heart failure

→ Converted to:

" shortness of breath may be explained by myocardial infarction, pulmonary embolism, or congestive heart failure."

**symptom,diagnosis**

orthopnea,congestive heart failure

orthopnea,asthma

chest pain,gerd

→ Converted to:

"Orthopnea may be explained by congestive heart failure, asthma, or gerd"

---

Ranking diagnoses based on number of symptoms matched:

9

**Exhibit 44: API Output Suggesting Combined Use of WebMD Frontend and Possible Open Ai Backend Diagnostic Logic**

→ patient with chest pain, shortness of breath, and orthopnea mostlikely have congestive heart failure **(3)**, but less likely myocardial infarction **(2)**, or pulmonary embolism **(2)**.

[These examples illustrate how structured data (e.g., CSV symptom-disease pairs) are typically converted into linearized inputs for LLM fine-tuning or prompt conditioning, based on standard practices documented in OpenAI fine-tuning protocols and NLP literature.")
OpenAI fine-tuning docs: Stanford's Alpaca/MedQA papers on symptom translation.
https://platform.openai.com/docs/guides/model-optimization]

**15. Legal Interpretation:** Based on the webpage inspection of WebMD symptoms checker:

   I.    Adopted core mechanisms **protected by my active patent**, particularly the transition of **symptom-disease tables into structured delimited formats** for LLM ingestion,

   II.    Implemented an approach of **diagnosis generation using feature-matching, ranking logic, and symptom-based explanation**, all of which are explicitly claimed in my patent filings.

16. The fact that ChatGPT may **avoids using visual tables** and instead uses **comma-delimited or sentence-based logic structures** does not avoid infringement. Patent law protects the **underlying method and utility**, not merely the visual representation.

17. Under 35 U.S.C. § 271, patent infringement may occur when any party uses, sells, or offers to use a patented process or method. Furthermore, under the Doctrine of Equivalents, a device or method that performs substantially the same function in substantially the same way to achieve the same result is also considered infringing, even if the implementation differs in superficial format (e.g., table vs. comma-delimited text).

**18. Legal and Strategic Implications:** Any system that:

   I.    Accepts arbitrary symptom combinations

   II.    Uses a master differential table to match symptoms

   III.    Intersects multiple outputs to isolate shared diseases

IV.    Ranks results based on frequency or clinical weight (prevalence)

**19. Conclusion:** This behavior **squarely falls within the scope of infringement** under Kabir Patent Claims 1, 9, 10, 12, and 13. Unless WebMD is licensed, this constitutes **ongoing direct and/or contributory infringement**. It also raises concerns of **trade secret misappropriation** if these logic structures were derived from proprietary datasets or frameworks. Plaintiff respectfully refers the Court to Exhibit 32, previously submitted, containing a comprehensive validity analysis of U.S. Patent No. 11,972,865, and to Exhibits 28 and 29, which provide element-by-element claim chart analyses demonstrating infringement.

**11. Disclaimer:** Plaintiff infers based on observable JSON structure, symptom-matching behavior, and frontend-backend consistency that the underlying mechanisms operate in a manner consistent with the limitations of Plaintiff's asserted claims. Discovery will confirm the precise source and integration of this logic.

**Dated: September 8, 2025**

**/s/ Azad Kabir**
Dr. Azad Kabir, MD
Pro Se Plaintiff
1120 Beach Blvd
Biloxi, MS 39530
Email: azad.kabir@ddxrx.net
Tel: (228) 342-6278

Exhibit 42



Document 42

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

**Azad Kabir, MD,**
Plaintiff,

v.

**WebMD, LLC, et al.**
Defendants.

Civil Action No.: 4:25-CV-00130-CDL

**PLAINTIFF'S BRIEF RESPONSE TO DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff, proceeding pro se, respectfully submits this brief response to Defendant's opposition.

1. **Admissions by Mr. Abdallah Abuhussein:** In a sealed declaration, Mr. Abdallah Abuhussein stated in his own words (point 9): *"The version of Symptom Checker incorporating the usage of a third-party service was launched in about April 2018. At the time, WebMD developed a completely new user interface and necessary infrastructure for its Symptom Checker tool in order to interact with the third-party service and present the potential condition determinations made by the third-party service in easy-to-understand language for users."* This testimony directly confirms Plaintiff's position that WebMD's Symptom Checker was altered in April 2018, which corresponds precisely with the timeline in which Thoughti, Inc. obtained access to the Doctor AI server, as documented in **Exhibit A, pages 2 and 3.**

2. Mr. Abuhussein also stated in point 8 that *"WebMD does not use or maintain a table of medical data for associating potential medical conditions or diseases with symptoms entered by users into the Symptom Checker tool."* This statement constitutes an indirect admission that WebMD had previously relied on a different method, and then abruptly shifted in 2018 to the approach covered by the Kabir patent. This change is clearly demonstrated in **Exhibit 25 (Presentation Slides 6 and 8),** which show the differences between the pre-2018 and post-2018 versions of WebMD's Symptom Checker.

3. Mr. Abuhussein further testified in point 7 under section 4 that *"the Symptom Checker transmits the single request to a third-party service, and in return, receives an ordered*

**Document 42**

*list of potential medical conditions related to the user's symptoms."* This testimony aligns directly with Plaintiff's patent validity claims. Notably, the exact word Mr. Abuhussein used — *"ordered"* — corresponds with the language of **Patent Claims 9, 11, and 12** (see **Exhibit 32, pages 7–17**). The use of this specific terminology strongly indicates Mr. Abuhussein's prior knowledge of the Kabir patent claims and further supports Plaintiff's assertion of infringement.

4. According to Mr. Abuhussein, WebMD collects user symptoms and transmits them to a third-party company, where the database is stored and the symptom–disease mapping is performed. Whether this database resides on WebMD-owned servers or on third-party servers, the results produced by WebMD's Symptom Checker are identical to those described in Plaintiff's **Patent Validity Analysis (Exhibit 32)** and **Claim Chart Analyses (Exhibits 28 and 29)**. Specifically, an **ordered list of potential medical conditions related to the user's symptoms** is generated and returned to WebMD through an **API (Application Programming Interface)**.

5. The claim chart analysis conducted by independent expert **Patrick Cummings** (Exhibit 28, completed in 2025) demonstrated that WebMD's servers contained the symptom–disease mapping function (see page 3 of Exhibit 28), and that this functionality was not the product of an API. If an API had been used at that time, the "Inspect" tool (a function accessed by right-clicking on a webpage and selecting "Inspect," which allows the user to view the underlying code and any database or API links) would have revealed its presence. This feature, as shown in Exhibit 28, page 3, confirms the existence of the database function within WebMD's servers. The statements made by Mr. Abuhussein cannot be reconciled with the contemporaneous evidence in Exhibit 28, which undermines the reliability of his declaration.

6. Mr. Abuhussein's declaration also suggests that data spoliation may already have occurred. His statement indicates that WebMD switched to a new interface with a third-party in 2025 while retaining the same user-facing functionality. Plaintiff notes that this timing coincided with when Plaintiff posted news of the WebMD lawsuits on LinkedIn (**Exhibit 38**), which may have warned Defendants, prompting them to transfer the trade secret functionality to third-party servers in 2025.

7. This declaration further confirms that WebMD currently collects symptom inputs and transmits them to a third party for processing. The third party, using a database of symptom–disease mappings, generates an ordered list of possible conditions and returns it to WebMD via an API. This process continues to constitute **willful infringement** of the Kabir patent. Outsourcing the patented functionality to a third party does not absolve WebMD of liability for **patent infringement, trade secret misappropriation, or copyright violations**

**Document 42**

8. Even if Mr. Abuhussein's testimony is accepted as true, it still establishes willful infringement of the Kabir patent. Obtaining the patented functionality from a third party does not immunize WebMD from liability for trade secret misappropriation, copyright infringement, or patent infringement. Moreover, in point 6 of his declaration, Mr. Abuhussein explicitly admitted: *"I am aware that WebMD's Symptom Checker tool has been accused of infringing U.S. Patent No. 11,972,865."* This admission, along with his use of the word *"order"* (point 7 under section 4: *receives an ordered list of potential medical conditions*), which is borrowed from Kabir patent claims 9, 11, and 12, demonstrates that he was aware of Plaintiff's patents yet nonetheless allowed WebMD to continue infringing, which further confirms the willfulness of the infringement.

9. Mr. Abuhussein's testimony establishes that WebMD relies on a third-party service for its Symptom Checker functionality. This admission raises the possibility that other large technology (Big Tech) providers may also be involved in deploying Plaintiff's patented technology, as Exhibit 32 already presented similarity of DxGPT symptoms checker and Plaintiff witnessed similarities with other LLM-based symptoms checkers (Exhibit 38). Plaintiff does not present this as a resolved fact but notes it for preservation purposes and to ensure discovery can fully identify all entities engaged in infringement and trade secret misappropriation. In the future, multiple other defendants can be added based on discovery from WebMD.

10. The declaration of Mr. Abuhussain demonstrates that WebMD is knowingly infringing the Kabir patent through one or more third parties, and strongly suggests that many large technology companies may also be involved—an issue I have already reported to the **Department of Justice**.

11. Mr. Abuhussein's declaration in point 10 about "In January 2025, WebMD launched a new version of Symptom Checker utilizing a **different third-party** service for the determination of potential conditions related to the user's symptoms. The current user interface is **virtually unchanged from the previous version**, and the **change in the third-party service** provider is undetectable to the user." This declaration indicates that a third party possibly changed their name, given the service provided to the patient is virtually undetectable to the user. Unless the underlying core database and algorithm were not altered, the service itself would not appear different.

12. In addition, this declaration (point 10) validates WebMD infringing the same patented algorithm since 2018, and even if they changed the user interface in 2025, it did not change the core algorithm as the service did not change. The Claim chart analysis done in 2024 and 2025 shows similar results, despite the system being changed in the interim.

**Document 42**

13. Mr. Abuhussein testified that since January 2025, WebMD has used a new third-party service, though the user interface remains virtually unchanged. Plaintiff has shown in **Exhibit 29** that the WebMD system used to (in 2024) include a step asking "Which system is bothering you the most" **(Claim Chart Analysis by Neha Sharma)**.

14. I have specifically obtained the dependent claim 11 (of the continuation patent, still active, which may allow more claims) to tackle WebMD (see claim chart analysis Exhibit 29, page 10), but WebMD recently dropped the step. Sounds like it happened after my patent is granted in 2024, as WebMD was watching closely, they may have knowledge about the patent.

15. Also, subsequent knowledge about trade secret misappropriation possibly leads them to change to a third-party-based service (using an API - application programming interface) based on a third-party server, which can be discovered during forensic analysis of the WebMD electronic system and financial system.

16. The plaintiff will file a separate motion for forensic analysis of the WebMD electronic system and financial system to identify third-party money trails and validate the declaration of Mr. Abuhussein.

17. **Though WebMD switched and dropped dependent claim 11 steps**, which requires arranging isolated common disease data in a ranked order based on patient-specific symptoms that bothering them the most. The cosmetic change in the interface does not alter the underlying infringement.

18. Mr. Abuhussein further claimed that he is unfamiliar with Thoughti, Inc. or its principals, but as a data manager, he is not positioned to know which third parties are involved in purchasing, and trade secret misappropriation, or contracting.

19. Plaintiff has requested via email that WebMD's CEO testify directly as to whether WebMD is collaborating with Thoughti (Exhibit 39) or any other third party, but such testimony or declaration has not been provided. Instead, the defense has not produced any C-suite level executive who might have knowledge about any purchase, such as the Symptom Checker purchase, which is WebMD's primary business tool that attracts traffic to its website. Such absence raises serious questions about nondisclosure.

20. **Validity of the Kabir Patents:** Plaintiff attaches **Exhibit 32 – Patent Validity Analysis (133 pages).** This comprehensive document demonstrates the validity of the Kabir patents and documents the injury Plaintiff sustained due to WebMD's infringement (Pages 63–64).

Document 42

21. **In Exhibit 32** – Patent Validity Analysis (133 pages), pages 73–77 discuss the prior art system DXplain, which the defense relied upon in an attempt to invalidate the Kabir patent. The conclusion about DxPlain validity analysis mentions (**see Exhibit 32, page 77**), while DxPlain incorporates probabilistic reasoning, it remains constrained within a predefined knowledge base and does not perform **real-time frequency-based isolation and ranking** across the symptom–disease dataset, which is the novel feature of the Kabir patent. Thus, Defendant's reliance on DXplain as invalidating prior art is misplaced.

22. From the declaration of Mr. Abuhussein who is a manager of the system, who did not develop the system or was not supposed to make new purchase decision from his designation and declaration, raises concern that WebMD is a one of the puzzle of massive trade secret misappropriation ongoing and it also explains why other big techs are coming with similar system (Presented in Exhibit 32 page 108). This was one of the reasons I offered WebDM an early settlement to keep other competition at bay as they risk losing a total $700 million yearly revenue, as that third party is selling my patent product to all the big techs.

23. I cannot conceive why WebMD would continue to litigate rather than protect my invention, as they know their system is infringing on the Symptom Checker and that there is a third party making sales to all the competition. Unless WebMD has a contract with the third party preventing them from selling to anyone else who wants to offer a symptom checker, their position is unreasonable.

24. Based on Mr. Abuhussein's declaration, there are multiple third-party entities involved in maintaining databases and tables, which indicates that a much larger trade secret misappropriation may be ongoing and could potentially jeopardize Plaintiff's personal safety. Accordingly, Plaintiff submitted **Exhibit 37 – Declaration of Dr. Azad Kabir Regarding Personal Safety and Risk of Harm** under seal

25. Based on Mr. Abuhussein's declaration in point 11 (I am not aware of, nor have I ever had any interactions with, a company called THOUGHTi Inc, nor the individuals allegedly associated with that company, Nilesh Patkar or Anupam Das), WebMD failed to indicate who the third party is and given no name is disclosed, we cannot investigate what relationship Thoughti has with the third party. Unless WebMD fully discloses all details of third parties, it is very suspicious that WebMD is knowingly infringing the patent and committing trade secret misappropriation. Also, submitting this information under seal is a way to protect the third-party name, which can be their own affiliate.

26. Furthermore, not having the database on their own server does not exclude them from trade secret misappropriation, given that they are benefiting from the theft through a

**Document 42**

third-party server (possibly via API connection). This might be because WebMD knows about the data theft and did not want to keep the stolen data on its server (or recently moved to a third party, as previously shown by Exhibit 28), and therefore asked those providing the service to create a third-party server with a connecting API to protect its interests.

27. Mr. Abuhussein self-incriminated WebMD about all the complaints of complaints and time lines validated my claims in his declaration.

28. **Need for Immediate Relief:** Taken together, Mr. Abuhussein's testimony, which confirms almost all the timelines in conjunction with claim chart analysis (Exhibit 28 and 29) and patent validity analysis (total 133 page, Exhibit 32) show overwhelming evidence of ongoing infringement and willful disregard of Plaintiff's patents, trade secret misappropriation using different third party to conceal trade secret misappropriation, possibly switched to external third party server recently as evident by Exhibit 28 which raises concern about data spoilage. Mr. Abuhussein's testimony also implicates potential multiple third-party actors, or same third party changing names, and WebMD's potential awareness about Kabir's patent as they dropped the infringement of claim 11 (dependent claim about bothering the most), raising the risk of a broader scheme to distribute Plaintiff's patented technology across the industry.

29. Mr. Abuhussein's testimony also mentions that point 7 (5) "**Symptom Checker matches the potential conditions with related WebMD articles, and presents the ordered list with related articles to the user.**" I have a continuation patent active and currently have a dependent pending claim which addresses linking rank-ordered diagnosis with disease-related articles. This will be a separate lawsuit about patent infringement once new patent claims are granted.

30. Mr. Abuhussein's testimony also mentions in point 7 under 5 that "presents the ordered list with related articles to the user," which violates the dependent claim 4 (**Exhibit 32, page 25, 26**)

31. **Ancillary Issues 1:** This aligns with Plaintiff's Complaint, which alleged infringement beginning in 2018. Mr. Abuhussein's testimony also opens the door to evidence of a broader conspiracy to misappropriate trade secrets by funneling patented technology through multiple third-party providers, or through a single third-party provider that is changing names to evade law and justice. These third parties may have access to other big tech companies. This makes the current lawsuit much larger, and other big tech players may be brought in as defendants once discovery of WebMD's system is completed.

**Document 42**

32. **Ancillary Issues 2:** Plaintiff has met with multiple Department of Justice attorneys from Washington, D.C., as well as local attorneys and FBI agents, regarding the trade secret misappropriation issues in this case. In his declaration, Mr. Abuhussein stated in point 10 that "in January 2025" WebMD purchased Symptom Checker services from a different third-party provider. This admission qualifies under the federal trade secret misappropriation statute's six-year rule, as my original Complaint alleged misappropriation beginning in 2018 (2018 + 6 = 2024). The DOJ had previously indicated the need for new evidence to demonstrate that trade secret misappropriation is ongoing. Mr. Abuhussein's testimony provides exactly that: direct evidence of continuing trade secret misappropriation which falls within its statute.

33. **Ancillary Issues 3:** In light of Defendant's admissions and accompanying analysis of this response suggesting ongoing third-party involvement in the misappropriation of trade secrets, Plaintiff has referred relevant testimony to the U.S. Department of Justice for independent review. This filing does not ask the Court to resolve criminal matters, but respectfully preserves the record of those concerns.

34. **Likelihood of Success on the Merits: Admissions from Mr. Abuhussein:**

    a) **Mr. Abuhussein** admits that *"The version of Symptom Checker incorporating the usage of a third-party service was launched in about April 2018"*. This aligns with Plaintiff's evidence that Thoughti, Inc. obtained access to the Doctor AI server in 2018 (Exhibit A).

    b) Point 8: **Mr. Abuhussein** admits that *"WebMD does not use or maintain a table of medical data"*, which indirectly concedes that a material shift in architecture occurred in 2018, matching the Kabir patent approach (see Exhibit 25).

    c) Point 7 (section 4): **Mr. Abuhussein** states that the tool receives *"an ordered list of potential medical conditions"*. The word *"ordered"* tracks precisely with Patent Claims 9, 11, and 12 (Exhibit 32, pp. 7–17).

35. **Exhibit Support**

    a) Exhibit 28 (Cummings analysis, 2025): Demonstrates that WebMD servers themselves contained the symptom–disease mapping, contradicting WebMD's "third-party only" claim.

    b) Exhibit 29 (Neha Sharma chart): Shows that WebMD's 2024 system included steps (e.g., *"Which system is bothering you the most"*) directly infringing dependent Claim 11, dropped only after Kabir's patent grant in 2024.

**Document 42**

   c) Exhibit 32 (133-page validity analysis): Demonstrates infringement, willfulness, and refutes invalidity.

36. **Willfulness**

   a) Point 6 of Abuhussein's declaration: *"I am aware that WebMD's Symptom Checker tool has been accused of infringing U.S. Patent No. 11,972,865."* Despite that awareness, WebMD continued use.

   b) The deliberate use of the claim language "ordered" also shows knowledge and intent.

37. **Validity Arguments**

   a) Defense relies on DXplain. Exhibit 32 (pp. 73–77) shows DXplain lacks real-time frequency-based isolation and ranking — the novel feature of Kabir's patent. Thus DXplain is not invalidating prior art.

38. **Irreparable Harm**

   a) Ongoing infringement erodes the value of the Kabir patent and destroys the exclusivity that patents protect. Each day WebMD uses the patented functionality, Plaintiff loses control over licensing and competitive advantage.

   b) Spoliation risk is acute: Exhibit 28 and Mr. Abuhussein's testimony show WebMD moved processing to a third-party service right after lawsuit notice, coinciding with Plaintiff's LinkedIn post (Exhibit 38). Once data is transferred or destroyed, Plaintiff's trade secrets cannot be recovered.

   c) The transfer to outside servers in 2025 (point 10 declaration) is effectively concealment. This creates irreversible harm because Plaintiff's ability to prove full scope of misappropriation depends on preservation.

39. **Balance of Equities**

   a) Plaintiff will be permanently harmed without relief; WebMD will continue diverting the patented technology's value and dispersing it to third parties.

**Document 42**

b) Defendants, by contrast, are merely being asked to stop infringing conduct. Nothing in the injunction prevents lawful competition or the development of a non-infringing tool.

c) Plaintiff already offered an early settlement to WebMD to contain damages and limit competitors' access, showing reasonableness.

## 40. Public Interest

a) Protecting valid patents, deterring trade secret theft, and preserving the integrity of judicial proceedings all serve the public interest. Courts consistently hold that public interest favors enforcing intellectual property rights.

b) A preservation order ensures that judicial fact-finding is based on complete evidence, not hidden or destroyed records.

c) DOJ has been notified because the declaration confirms ongoing misappropriation within the six-year statute (2018–2025). While Plaintiff does not ask the Court to resolve criminal issues, this underscores why public interest requires swift civil relief.

41. Accordingly, Plaintiff respectfully requests that this Honorable Court:

a) **Grant preliminary injunctive relief** to prevent any further infringement of the Kabir patents;

b) **Enter a preservation order** to ensure that all evidence in the possession of WebMD and its third-party partners is preserved and produced during discovery; and

c) **Permit this response to be referred to the Department of Justice, notwithstanding its submission under seal, in light of the serious concerns that it constitutes evidence warranting a potential full DOJ investigation.**

## 42. CONCLUSION

a) **Likelihood of Success on the Merits**

Defendant's own witness testimony, combined with Exhibits 28, 29, and 32, confirms that WebMD's Symptom Checker practices the patented functionality. Mr. Abuhussein's admissions regarding "ordered" results, third-party reliance, and knowledge of the Kabir patent establish direct infringement and willfulness. The DXplain prior art arguments fail to anticipate or render the patent obvious.

**Document 42**

b) **Irreparable Harm**

Ongoing infringement, coupled with the risk of spoliation from outsourcing core databases to third-party servers, and trade secret misappropriation, threatens permanent loss of the value of Plaintiff's patent and trade secrets. Once destroyed or obscured, this evidence and harm cannot be remedied by damage alone.

c) **Balance of Equities**

The equities strongly favor Plaintiff. WebMD can continue to compete lawfully but must stop infringing. Plaintiff, by contrast, faces permanent and un-compensable harm if relief is denied. Plaintiff's willingness to explore settlement underscores his reasonableness, further tipping the balance in his favor.

d) **Public Interest**

Protecting valid patents and deterring trade secret misappropriation directly serves innovation and the rule of law. A preservation order safeguards judicial integrity by ensuring the evidence remains intact. While discovery may later reveal the role of additional third parties, the Court's immediate duty is to protect the patent system and prevent spoliation.

43. Plaintiff intends to file a separate public-facing response, relying solely on non-confidential documents, to detail prior precedents supporting the issuance of injunctive relief and preservation orders. This ensures that the Court may consider established case law without implicating sealed or sensitive information.

44. For these reasons, Plaintiff respectfully requests that the Court grant preliminary injunctive relief and enter a preservation order.

Respectfully submitted this 22nd day of August, 2025.

**/s/ Azad Kabir**
Azad Kabir, MD
Pro Se Plaintiff
1120 Beach Blvd
Biloxi, MS 39530
Email: azad.kabir@ddxrx.net
Tel: (228) 342-6278

**Dated: August 22, 2025**

**Document 42**

**Appendix: Exhibit Explanation Tables**

| Exhibit No. | Description | Relevance / Key Point |
|---|---|---|
| **Exhibit A** | Case Timeline of Events (Declaration of Dr. Azad A. Kabir with chronological record 2017–2025) | Provides a chronological summary of contractual engagements, server access, NDA, suspicious activity, patent grant, and evidence of WebMD's use of proprietary technology; ties all other exhibits into a coherent narrative |
| **Exhibit 25** | Presentation slides showing WebMD's Symptom Checker pre- and post-2018 | Demonstrates the abrupt switch in methodology in 2018, consistent with Plaintiff's allegation that WebMD adopted the Kabir patent method. |
| **Exhibit 28** | Claim Chart Analysis by Patrick Cummings (2025) | Shows WebMD's servers contained symptom–disease mapping functionality, contradicting WebMD's claim that only a third-party API was used. Establishes direct infringement and questions credibility of Abuhussein declaration. |
| **Exhibit 29** | Claim Chart Analysis (corroborating Exhibit 28) | Confirms mapping of Kabir's patent claims onto WebMD's accused systems, reinforcing likelihood of success on the merits. |
| **Exhibit 32** | Patent Validity Analysis (133 pages): **Confidential Attorney Eye Only** | Includes analysis of DXplain (pp. 73–77), showing why DXplain is not invalidating prior art. Confirms Kabir's patent is valid and enforceable. Also contains evidence of "ordered list" language identical to Kabir's claims 9, 11, 12. |
| **Exhibit 37** | **Confidential** | Declaration of Dr. Azad Kabir Regarding Personal Safety and Risk of Harm |
| **Exhibit 38** | LinkedIn posts by Plaintiff regarding WebMD lawsuit (2025) | Demonstrates Defendants may have been alerted by public postings, prompting transfer of trade secret functionality to third-party servers in 2025. |
| **Exhibit 39** | Email request for WebMD's CEO testimony | Shows Plaintiff's effort to obtain direct executive testimony on third-party collaborations; |

**Document 42**

absence of such testimony raises concerns of nondisclosure.

Document 42

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of August, 2025, I electronically filed the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record and other registered participants.

Respectfully submitted,

/s/ Azad Kabir
Azad Kabir, MD
Pro Se Plaintiff



# Exhibit 25: WebMD Patent Infringement Presentation

AZAD KABIR, MD, MSPH | Pro Se: Kabir V WebMD









FIG. 2



Kabir patents create a critical bottleneck by processing multiple open-ended questions for history collection

# Kabir Patent Supremacy

Patients typically present with few problems — what we call "symptoms."

It's the physician who gathers the rest of the story through thoughtful and guided questioning.

True healthcare automation is impossible if physicians are required to collect patient history.





## Excellence in History Taking:
## The Power of Open-Ended Questions



FIG. 2

- Q1: "What brings you in today?"

- Q2: "What else is going on?"

- Q3: "Is there anything else that's been bothering you?"

Reduce diagnostic error by allowing the patient's narrative to guide the encounter

You can't process patient history if you use more than one open-ended question (due to the Kabir Patent)



# How to Obtain Patient History?

| Patients Presenting Symptoms: | What is the most appropriate next best question? | |
| --- | --- | --- |
| What is bothering you? | Decision Tree Focused Question WebMD model before 2018 | Open-ended Question (Kabir Patent) Model WebMD Using Since 2018 |
| I have chest pain | On a scale of 0 -10, how bad is the pain? | What else? **Shortness of breath**... |
| | Is this pain radiating to your shoulder? | Anything else? **Fever** |
| I have abdominal pain | Is it stabbing pain, dull, burning, or crampy | What else? **Vomiting** |
| | Is the pain radiating? | Anything else? **Fever** |

## Prevent diagnostic delay and diagnostic Error: Using Open-Ended Question



# WebMD History Collection: Before 2018
## Architecture of the Decision Tree Model



Every node has a limited (two to three) path, whereas the Kabir reasoning model has many paths



# Decision Tree History Collection: WebMD (Before 2018)
## Forced to ask a question linked to the decision tree model





- Common complaints, such as sore throat, may prompt a brief survey to add more details.

Source:
http://symptoms.webmd.com/default.htm#/symptomview



### WebMD Symptom Checker

The WebMD Symptom Checker helps people pinpoint potential conditions associated with their physical symptoms. WebMD developed a tool that combines graphics with a series of prompts that allows users to select a variety of symptoms and delivers back possible conditions or ailments based on the symptoms. The information can also be used to better inform the doctor visit. WebMD's Symptom Checker was created by an experienced group of WebMD physicians, using the latest standards of evidence-based medicine, and an easy to user patent pending interface making entering symptoms a snap."
Courtesy Kate Hahn, WebMD PR





## Kabir Symptoms Checker System:

If symptoms are not linked in a decision-tree format, and are instead asked using open-ended questions, then the collected clinical history cannot be processed without infringing on Kabir's patent.

### Enter Your Symptoms:

Chest Pain

Shortness of breath

Orthopnea

Fever

Cough

Can't process random symptoms (open-ended question) without the Kabir patent



# WebMD Symptoms Checker: 2025
## Allow multiple open-ended symptoms

**Strength of match = number of symptoms matched / total number of symptoms**







**Citation:** Azad Kabir, Raeed Kabir, Jebun Nahar (2024) In Pursuit of an Expert Artificial Intelligence System: Reproducing Human Physicians' Diagnostic Reasoning and Triage Decision Making. J Artif Intel Soft Comp Tech 1: 1-14

## Study Findings:

The Kabir (Doctor AI) system achieves more accurate triage decisions while requiring significantly fewer questions (13.9 on average) than the Babylon system, which relies on a decision tree model and requires 62.3 questions.

## RESEARCH COMPARISON

Table 2: Comparison of Doctor Ai and Babylon Health Ai system in terms of time needed to find a diagnosis and provide triage decision

| Surrogate measure for time needed to complete | DoctorAi (n=15) | Babylon (n=15) | P Value (two sided) |
|---|---|---|---|
| Number of symptoms collected using open-ended questions to generate differential diagnosis.Number of symptoms collected using open-ended questions to generate differential diagnosis. | 2.8 (±0.86) | 1.0 (±0) | <0.001 |
| Number of screens used to collect history with open-ended questions (from the start to differential diagnosis): | 5.3 (±1.75) | 2.0 (±0) | <0.001 |
| Number of screens used to find the final diagnosis (from the start to end): | 7.8 (±2.08) | 21.5 (±9.63) | <0.001 |
| Number of screens to determine final disposition (from the start to end): | 10.0 (±2.33) | 21.5 (±9.63) | <0.001 |
| Number of Yes/No events to find the final diagnosis (from the point of differential diagnosis to end) | 13.9 (±6.54) | 62.3 (±31.55) | <0.001 |
| Did the Ai system provide a final diagnosis? | 100.0% (±0) | 53.3% (±0.13) | <0.001 |
| Disposition decision to hospital (versus general practitioner) | 26.7% (±0.11) | 33.3% (±0.12) | <0.08 |



**Kabir Patent: Rank ordering to reduce the diagnostic error and unnecessary testing**

Chest Pain + Shortness of breath (Need to find diseases that have both symptoms)

1. Myocardial Ischemia (2)
2. Pulmonary Embolism (2)
3. Pneumothorax (2)
4. Pneumonia (2)
5. Congestive heart failure (2)

Cost of ruling out 1, 2, 3, 4 diagnoses (laboratory, radiological tests, diagnostic delay, and mortality and morbidity) if you miss the symptoms of Orthopnea (Decision Tree takes 65 questions)

11



FIG. 3

ROBOT ASSISTED PATIENT CARE



12

## Summary:

## Finding the diagnosis that explains the MOST signs and symptoms (Decision Tree Fails here)

Chest Pain + Shortness of breath + Orthopnea

1. Congestive heart failure (3)
2. Myocardial Ischemia (2)
3. Pulmonary Embolism (2)
4. Pneumothorax (2)
5. Pneumonia (2)

Think about the cost-effectiveness of this hypothetico-deductive model. The top rank changes when new symptoms in play.



FIG. 4





13

# How do you get a rank-ordered list?

Find the total number of symptoms used for the search

Find the number of symptoms matched in each of the diagnoses

Calculate match strength (rank) = number of symptoms matched / total number of symptoms

Chest Pain + Shortness of breath + Orthopnea

1. Congestive heart failure (3/3 matched)
2. Myocardial Ischemia (2/3 matched)
3. Pulmonary Embolism (2/3 matched)
4. Pneumothorax (2/3 matched)
5. Pneumonia (2/3 matched)



FIG. 4

ROBOT ASSISTED PATIENT CARE

# EXHIBIT B

Docusign Envelope ID: 6048F510-41D4-4A80-9415-DC5970D0B63C

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## COLUMBUS DIVISION

AZAD KABIR,

                   Plaintiff,

v.

WEBMD LLC, and
THOUGHTI, INC.

                   Defendants.

Case No.: 4:25-cv-00130-CDL

## DECLARATION OF ABDALLAH ABUHUSSEIN

I, Abdallah Abuhussein, declare and state as follows:

1.      I am currently employed by WebMD LLC ("WebMD") as the Sr. Director of Engineering. I have been employed by WebMD since November, 2014 and have been a Director or Sr. Director of Engineering since August, 2022. I submit this Declaration in support of WebMD's opposition to the Plaintiff's motion for preliminary injunction filed in the above-captioned case.

2.      I am over 18 years of age and am personally knowledgeable of the matters set forth in this Declaration. If called upon to do so, I could and would competently testify to the following facts set forth below.

3.      WebMD is a health information website that provides comprehensive and up-to-date medical news, resources, and tools. It aims to empower the general public with credible and accessible health information.

4.      One tool that WebMD provides to its users is its Symptom Checker tool. This tool is an informational tool for identifying possible conditions and treatment related to the user's

Docusign Envelope ID: 6048F510-41D4-4A80-9415-DC5970D0B63C

symptoms. This tool does not provide medical advice and is not intended to be a substitute for professional medical advice, diagnosis, or treatment.

5.    I am familiar, and have been familiar since as early as 2017, with the operation, architecture, and system design of the Symptom Checker tool. In 2020, I took over management of the backend system for the Symptom Checker tool and have been responsible for it since.

6.    I am aware that WebMD's Symptom Checker tool has been accused of infringing U.S. Patent No. 11,972,865, issued on April 30, 2025, and titled High Probability Differential Diagnosis Generator and Smart Electronic Medical Record.

7.    Since about April 2018, Symptom Checker has operated in the same basic manner:

1) a user enters basic information about herself/himself into a WebMD-created interface;

2) the user enters symptoms the user may be experiencing into the WebMD-created interface;

3) Symptom Checker collects and assembles the user inputs into a single request;

4) Symptom Checker transmits the single request to a third-party service, and in return, receives an ordered list of potential medical conditions related to the user's symptoms; and

5) Symptom Checker matches the potential conditions with related WebMD articles, and presents the ordered list with related articles to the user.

8.    Because the potential medical conditions related to the user's symptoms are determined by the third-party service in Step 4, WebMD does not use or maintain a table of medical data for associating potential medical conditions or diseases with symptoms entered by users into the Symptom Checker tool.

9.    The version of Symptom Checker incorporating the usage of a third party service was launched in about April, 2018. At the time, WebMD developed a completely new user

Docusign Envelope ID: 6048F510-41D4-4A80-9415-DC5970D0B63C

interface and necessary infrastructure for its Symptom Checker tool in order to interact with the third party service and present the potential condition determinations made by the third party service in easy-to-understand language for users.

10.    In January 2025, WebMD launched a new version of Symptom Checker utilizing a different third party service for the determination of potential conditions related to the user's symptoms. The current user interface is virtually unchanged from the previous version, and the change in the third party service provide is undetectable to the user.

11.    I am not aware of, nor have I ever had any interactions with, a company called THOUGHTi LLC, nor the individuals allegedly associated with that company, Nilesh Patkar or Nupam Das.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: August 21, 2025

Signed by:

*Abdullah Abuhussein*

3B72A1CCCA9746D

Abdallah Abuhussein

4924-9242-6592.4

0  85227 01330  9

RECEIVED

SEP 16 2025

AT 8:30 ____ M
CLERK U.S. DISTRICT COURT - DNJ

AZAD ALAMGIR KABIR
(228) 342-6278
THE UPS STORE #3159
NOT A GOOD RETURN ADDRESS
7956 VAUGHN RD
MONTGOMERY  AL 36116-6625

1 LBS        1 OF 1
SHP WT: 1 LBS
DATE: 12 SEP 2025

SHIP  FEDERAL BUILDING & U.S. COURTHOUSE
TO:   CLERKS OFFICE MARTIN LUTHER KING JR
      RM 4015
      50 WALNUT ST

NEWARK  NJ 07102-3570

NJ 076 9-02

UPS GROUND

TRACKING #: 1Z E9Y 967 03 8296 2494

BILLING: P/P

SEE NOTICE ON REVERSE regarding UPS Terms, and notice of limitation of liability. Where allowed by law, shipper authorizes UPS to act as forwarding agent for export control and
customs purposes. If exported from the US, shipper certifies that the commodities, technology or software were exported from the US in accordance with the Export Administration
Regulations. Diversion contrary to law is prohibited.

MMUM21K0BJC8F ISH 13.88C ZZP238 EP 13.5V 08/2025

DCC

**Mailer Size:**
11 ½ x 14 ¼
**Mailer will hold:**
11 x 14 Photo Enlargements
8 ½ x 14 Documents

Made fro
Minimu