**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW JERSEY**

**AZAD ALAMGIR KABIR,**

Plaintiff,

v.

**WEBMD LLC, THOUGHTi INC., and JOHN DOE 1 (believed to be OpenAI, Inc.),**

Defendants.

**Civil Action No. 2:25-cv-15207 (EP) (JSA)**

---

**PLAINTIFF'S OPPOSITION TO WEBMD'S MOTION TO DISMISS (ECF 105) LIMIT TO 30 PAGES**

**Table of Contents**

I. PRELIMINARY STATEMENT ...................................................................................3
II. EXPERT DECLARATION ......................................................................................7
III. VALIDITY OF KABIR PATENT ..........................................................................11
IV. PROCEDURAL BACKGROUND ...........................................................................13
V. COPYRIGHT INFRINGEMENT AND TRADE SECRET MISAPPROPRIATION CLAIMS................18
VI. DEFEND TRADE SECRETS ACT (DTSA) AND COPYRIGHT STATUTE SATISFIED BY DEFENDANTS' OWN DECLARATION ........................................................................20
VII. ARGUMENT........................................................................................................21
VIII. REQUESTED RELIEF AND NEXT STEPS ..........................................................30
IX. CONCLUSION .....................................................................................................30

**TABLE OF AUTHORITIES (SEE ALSO OPPOSITION TO THOUGHTi 104, PAGE 2)**

| Case Name | Citation | Page(s) |
|---|---|---|
| Akamai Techs., Inc. v. Limelight Networks, Inc. | 797 F.3d 1020 (Fed. Cir. 2015) (en banc) | 17, 24, 25 |
| Alice Corp. v. CLS Bank Int'l | 573 U.S. 208 (2014) | 7, 11, 12, 30 |
| Amdocs (Israel) Ltd. v. Openet Telecom, Inc. | 841 F.3d 1288 (Fed. Cir. 2016) | 7 |
| Ashcroft v. Iqbal | 556 U.S. 662 (2009) | 26 |
| BladeRoom Grp. Ltd. v. Emerson Elec. Co. | 331 F. Supp. 3d 977 (N.D. Cal. 2018) | 22 |
| Enfish, LLC v. Microsoft Corp. | 822 F.3d 1327 (Fed. Cir. 2016) | 7 |
| Feist Publ'ns, Inc. v. Rural Tel. Serv. Co. | 499 U.S. 340 (1991) | 18, 21 |
| In re Burlington Coat Factory Sec. Litig. | 114 F.3d 1410 (3d Cir. 1997) | 14 |
| Mele v. Fed. Reserve Bank of New York | 359 F.3d 251 (3d Cir. 2004) | 6, 14 |
| Stratienko v. Cordis Corp. | 429 F.3d 592 (6th Cir. 2005) | 28 |
| Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp. | 68 F.4th 792 (2d Cir. 2023) | 22 |
| Tanksley v. Daniels | 902 F.3d 165 (3d Cir. 2018) | 22 |
| Three Boys Music Corp. v. Bolton | 212 F.3d 477 (9th Cir. 2000) | 28 |
| Travel Sentry, Inc. v. Tropp | 877 F.3d 1370 (Fed. Cir. 2017) | 24 |
| Bell Atl. Corp. v. Twombly | 550 U.S. 544 (2007) | 26 |

**PLAINTIFF'S OPPOSITION TO WEBMD'S MOTION TO DISMISS (ECF 105) PAGE LIMIT 30**

1.    Plaintiff, Dr. Azad Alamgir Kabir ("Plaintiff"), respectfully submits this **Opposition to Defendants' Motion to Dismiss**. For the reasons set forth below, Defendants' motion should be denied in its entirety.

2.    **Exhibit Clarification.** This 30-page compliant Opposition relies primarily on exhibits already filed on the CM/ECF docket or previously filed with the Third Amended Complaint. Only a limited number of exhibits are physically attached to this filing, and only where those materials were not previously uploaded to ECF or are included solely for record-preservation purposes.

3.    **Rule 12(b)(6) Disclaimer.** Plaintiff does not rely on any exhibits to prove facts for purposes of this Rule 12(b)(6) motion. All exhibits are provided solely for background and record preservation. At this stage, Plaintiff relies exclusively on the well-pleaded allegations of the Third Amended Complaint, which must be accepted as true and viewed in the light most favorable to Plaintiff. Conversion to summary judgment is improper.

**I. PRELIMINARY STATEMENT**

4.    **Foundation of the Patent and Core Issue in Suit:** The patent at issue claims a **computer-implemented system** that transforms unstructured clinical inputs into a **rank-ordered differential diagnosis** through structured, reproducible computation. The invention is grounded in the linguistic fact that both **symptoms** and **diseases** are *nominal data*—that is, name-based identifiers such as "fever," "chest pain," or "appendicitis," which possess no inherent numeric value and cannot be averaged or regressed mathematically. To compute meaningful associations between such variables, the system implements a

3

**structured symptom–disease mapping table** (or multi-dimensional matrix) in which one axis represents symptoms and the other diseases. Each cell records whether a symptom is known to occur with a disease. The algorithm then calculates, for a patient's entered symptom set, the number of intersections between symptoms and each disease entry— producing a measurable **frequency-based strength of association**—and refines the ranking by applying a **disease-prevalence weight** as a rational tiebreaker.

5.      This structured mapping and frequency-based computation form a concrete data-processing architecture, not a mental exercise. It enables consistent diagnostic ranking where previously there was none, providing a technical solution to the problem of unstructured or language-based medical input. Importantly, modern **large language models (LLMs)** also rely on nominal or "name" data—tokens representing words and medical terms—and therefore implicitly depend on the same kind of symptom–disease association logic when producing ordered differential diagnoses. The present action arises because the Third amended complaint plausibly alleges that the Defendants' LLM-based systems replicate the patented cognitive computational framework that converts nominal linguistic data into structured, ranked diagnostic output, a process protected by the Kabir patent and central to this dispute.

6.      **Defendant's Omission of the Abuhussein Declaration (ECF 40-2, M.D. Ga.):**

Defendant **WebMD's Motion to Dismiss** conspicuously omits any reference to the sworn **Abuhussein Declaration** (ECF 40-2, M.D. Ga.) previously submitted in the Middle District of Georgia, even though that testimony was central to WebMD's earlier defense that ■

████████████████████████████████████████████████████████

████████████. This omission is significant. If WebMD still relied on that declaration, it would directly confirm the new technical and timeline evidence (Exhibits A (ECF 59—26), 44.1 (ECF 122-3), 45 (ECF 122-4), 90 (ECF 122-14), 91 (ECF 122-15), 92 (ECF 122-16), and 93 (ECF 122-17)] showing that WebMD's system incorporates the same mapping and ranking logic described in Plaintiff's patents, copyrights, and trade secrets. This omission creates a factual inconsistency that cannot be resolved at the 12(b)(6) stage.

7.      **Exhibit 92, see ECF 122-16,** contains a **forensic-level analysis of multiple screenshots** taken from the WebMD browser "Inspect" tool—specifically the **Preview**, **Payload**, and **Header** panels captured during Symptom Checker requests. These screenshots were then analyzed using the OpenAI GPT-5.1 model, whose complete, live, unaltered analysis is preserved at a publicly accessible link, accompanied by a **sworn declaration confirming that no portion of the ChatGPT 5.1 analysis was modified, edited, or altered in any form**. The forensic review demonstrates that WebMD's internal microservice ("production-athena-symptom-checker") executes a server-side AI inference engine that explicitly identifies the deployed model as **"saas-openai-gpt-4o-mini,"** with all processing occurring **internally within WebMD's Kubernetes environment** and **not through any external OpenAI or Athenahealth API call**. The system returns structured, ranked diagnostic outputs—"High Match," "Moderate Match," severity values, WebMD condition-IDs, and synonym mappings—that replicate the structured-table, intersection-based, and prevalence-weighted diagnostic-ranking methodology protected by Plaintiff's patent and trade secrets. These findings **directly contradict WebMD's Abuhussein sworn claim** (ECF 40-2 ¶ 8) that it " ████████████████████

██████████████████████████████████████

████████████████████ ", because the internal model and microservice depend on hidden structured datasets and mappings to generate ranked results. The concealed server-side workflow revealed by the forensic screenshots supports Plaintiff's allegations of **copyright infringement, trade-secret misappropriation, and unauthorized use of the patented diagnostic-ranking method**.

**8.**    Defendants could easily rebut the copyright and trade-secret claims by producing the underlying data structures or by relying on the Abuhussein Declaration (ECF 40-2, M.D. Ga.), yet they **chose not to attach that declaration to their Motion to Dismiss**, despite having opportunities to do so. Instead, Defendants rely on procedural maneuvering against a pro se litigant in an effort to avoid reaching the merits and to deprive Plaintiff of a fair adjudication of his claims. This absence supports the reasonable inference that WebMD's servers do [Exhibits, 90, 91], in fact, maintain the type of internal medical-mapping tables required to generate ranked diagnostic outputs—precisely the functionality described in Plaintiff's intellectual property.

**9.**    By declining to cite or rely upon its own engineer's prior sworn statement (Abuhussein Declaration), WebMD effectively **acknowledges that the declaration is no longer credible or defensible**, and that its contents are inconsistent with the record now before this Court. Such deliberate omission functions as an implicit admission that the Abuhussein testimony (ECF 40-2, M.D. Ga.) cannot withstand scrutiny and that Defendants seek to distance themselves from prior false or misleading representations already in the case file. *See* **Fed. R. Evid. 801(d)(2)** (party-opponent admissions); *Mele v. Federal Reserve*

*Bank of N.Y.*, 359 F.3d 251, 255 n.5 (3d Cir. 2004) (recognizing party's prior inconsistent statements as admissible evidence).

## II. EXPERT DECLARATION

**10.**    Patrick Dean Cummins is a seasoned patent attorney and electrical engineer with extensive experience in patent prosecution, litigation strategy, and technology evaluation. In my opinion, his background as a former USPTO examiner and his work on hundreds of patent applications give him a strong grasp of claim construction and infringement analysis, particularly in fields involving automation and AI-driven systems.

**11.**    Based on his education, training, and professional experience, Patrick Cummins declares [**Exhibit 85, see ECF 122-13**], analyzing the validity of U.S. Patent No. 11,972,865 B1 under 35 U.S.C. § 101 and the Alice/Mayo framework. After reviewing the patent's specification, drawings, and claims 1 through 13, and comparing them with controlling Supreme Court and Federal Circuit precedent—including *Alice v. CLS Bank Int'l*, *Enfish v. Microsoft*, and *Amdocs v. Openet Telecom*—Mr. Cummins concluded that the '865 Patent is directed to patent-eligible subject matter. He explains that the invention concerns a concrete medical-database architecture that transforms unstructured clinical inputs into structured, rank-ordered differential diagnoses through computational mapping of symptoms to diseases and dynamic re-ranking based on disease prevalence within a population. The system thus improves how computers store, retrieve, and process medical data, rather than merely automating a mental process. Mr. Cummins finds the claims analogous to those upheld in *Enfish*, where a self-referential data table was deemed a

7

specific improvement in computer functionality, and in *Amdocs*, where correlating data from multiple sources was held patent-eligible because it enhanced network efficiency. Likewise, the '865 Patent's reliance on a medical differential-diagnosis database that inherently reflects disease prevalence constitutes an unconventional data-structure improvement that yields more accurate and efficient diagnostic output.

12.    **Mr. Cummins opines—under penalty of perjury—that the '865 Patent is patent-eligible and directed to a computer-implemented system that improves diagnostic reasoning and clinical-decision technology.** This reference is made solely to illustrate that the legal theory pled in the complaint is consistent with controlling § 101 precedent and therefore states a plausible claim at this stage.

13.    Dr. Azad Alamgir Kabir, MD, MSPH, is a board-certified internist and physician-scientist, software developer,  and has over two decades of clinical and data-science experience and is the inventor of multiple patented AI-driven diagnostic systems, including ClinicalAssist and Doctor AI.

a.    Based on his education, training, and professional experience, Dr. Kabir opines **[Exhibit 82]**, based on his review of prior art and field practice, that the symptom–disease intersection approach is the only practicable method readily capable of producing reproducible, rank-ordered differentials from open-ended symptom input. This opinion is offered **subject to testing in focused discovery and forensic inspection** of the defendants' backend systems.

b.    Accordingly, any **computer-implemented system** that maps symptoms to diseases and computes intersections to generate a **rank-ordered differential diagnosis** necessarily practices

the patented method. No other algorithmic pathway can perform this reasoning without applying the structured, frequency-based database derived association logic and prevalence weighting claimed in the Kabir patent.

14.    As shown in newly submitted **Exhibit 90, see ECF 122-14, (WebMD Symptom Checker Claim-Chart Mapping, Copyright, and Trade Secret Misappropriation Evidence)**, and in rebuttal to Defendants' assertion that no element-by-element mapping was provided, Plaintiff demonstrates that each limitation of **Claim 12—and, by equivalence, Claim 9—of U.S. Patent No. 11,972,865 B1** ("High-Probability Differential Diagnoses Generator and Smart Electronic Medical Record") corresponds to features present within the **WebMD Symptom Checker**. The color-coded mappings (**labels 1A–4C**) align each claim limitation—including data collection, table linkage, intersection logic, and ranked diagnostic output—with identical computational operations observed in WebMD's live, publicly available system and backend JSON responses. The screenshots further reveal that WebMD's system reproduces copyrighted **database schema and ranking expressions**, showing the same **symptom–disease mapping, prevalence weighting, and intersection-based ranking logic** described in my intellectual-property filings. In addition, the internal server outputs—such as webmd_condition_id, mapping.url, and condition_arr—replicate the **disease-severity, mortality, and relevance-weighted algorithms** defined in the protected trade-secret framework. Based on these findings, **Exhibit 90** demonstrates that WebMD's Symptom Checker reproduces both the **functional logic** and **expressive structure to accommodate the intersection logic** of my patented,

copyrighted, and trade-secret-protected system, thereby constituting infringement and misappropriation of my intellectual property.

15.    As demonstrated in **Exhibit 91, see ECF 122-15** (*WebMD Symptom Checker Claim-Chart Mapping, Copyright Infringement, and Trade Secret Misappropriation Within the Server*), every element of **Claim 1 of U.S. Patent No. 9,536,051 B1 ("High-Probability Differential Diagnoses Generator")** corresponds directly to WebMD's symptom-entry and ranking workflow. Unlike the later '865 Patent, these claims are **more granular**, illustrating step-by-step how WebMD enables a user to enter patient symptoms through a text-box interface, type a character, and receive an **auto-suggested, selectable list** of clinical findings—precisely the "selection means" recited in elements [1A–1C] and [2A–2C]. This patent, **granted in 2016**, pre-dates both the '865 Patent and WebMD's current architecture, yet the same methodology remains visible in WebMD's live system today. The screenshots and JSON payloads in Exhibit 91 show that WebMD continues to perform the identical symptom-to-disease comparisons, intersection logic, and ranked output that define Claim 1 and Claim 2 of the '051 Patent. While the '865 continuation later condensed and optimized these steps—forming the basis for the "High-Probability Differential Diagnoses Generator and Smart Electronic Medical Record"—the '051 Patent's granular claim language makes infringement even clearer. It demonstrates that WebMD's drop-down symptom boxes, auto-complete selection means, and weighted differential outputs replicate the patented diagnostic framework exactly, evidencing ongoing use of Dr. Kabir's protected logic first disclosed and allowed nearly a decade ago.

16.    Plaintiff submitted an updated **254-page Patent Validity Analysis** (updated on November 9th, **Exhibit 32.2 (see ECF 107-1)** filing under seal, and a paper copy was mailed by local rules) confirming the patent's novelty and enforceability, and four claim chart analyses [**Exhibits 28 (ECF 59-21), Exhibit 29 (ECF 59-22) and Exhibits 90 – 91]** showing element-by-element infringement and patent validity. At the pleading stage, nothing more is required.

### III. VALIDITY OF KABIR PATENT

17.    On a Rule 12(b)(6) motion, the Court must accept the complaint's factual allegations as true and ask only whether they state a plausible claim.

18.    Defendants' patent-validity challenge is meritless. Plaintiff has already provided a comprehensive 254-page **validity analysis of U.S. Patent No. 11,972,865 and U.S. Patent No. 11,972,051** (see updated Exhibit 32.2, ECF 107-1), confirming novelty and enforceability. Nothing more is required at the pleading stage to establish the patents' validity.

19.    **Alice/Mayo framework:** The '865 Patent was granted in 2024—nearly a decade after the Supreme Court's decision in *Alice*. By that time, the USPTO had already implemented rigorous §101 examination procedures to ensure new patents satisfy the *Alice* framework. Thus, the issuance itself reflects that the claims passed compliance with the two-step framework. In addition, **see the Declaration of Patent Expert Patrick D. Cummins (Exhibit 85, see ECF 122-13)**, which further confirms that the '865 Patent satisfies the *Alice/Mayo* framework and is directed to patent-eligible subject matter. To conserve the page limits, Plaintiff incorporates by

reference **Exhibit 32.2**, including **Chapter 2 (Patent Validity Assessment)** and **Chapter 14, Inventiveness — "Validity of Kabir Patent: Alice/Mayo Framework," pp. 249–253**, which provide the complete technical and legal analysis. Plaintiff limits the discussion here and respectfully directs the Court to those chapters if further detail is desired.

a)      **Alice Step 1 – Not Directed to an Abstract Idea:** The asserted claims are not directed to a mere mental process or abstract idea. They recite a specific, concrete sequence of computer-implemented steps: (i) collecting patient medical data; (ii) mapping that data to structured differential-diagnosis tables; (iii) isolating only those diseases common across multiple symptoms; and (iv) ranking those diseases using frequency and prevalence logic. This is not generic data sorting; no human brain can perform these exhaustive techniques. It is a particularized computerized clinical decision making by removing the need for humans in patient care —how to algorithmically generate accurate differential diagnoses from incomplete, unstructured patient inputs. Courts have held that such rule-based, computer-implemented diagnostic methods, when tied to specific data structures and ranking logic, are patent-eligible.

b)      **Alice Step 2 – Inventive Concept:** Even if the Court were to consider the claims abstract, they recite an inventive concept sufficient to transform them into patent-eligible subject matter. The combination of intersection logic, prevalence-based re-ranking, and patient-prioritized symptom weighting is not found in the prior art. Decision-tree systems, Bayesian networks, or black-box AI do not perform these steps in this structured sequence. The claims improve the functioning of computer-assisted diagnostic technology itself by producing safer, more accurate ranked lists and enabling triage with fewer questions, as demonstrated in published validation

studies. That is a "technical improvement in computer functionality," which the Federal Circuit repeatedly recognizes as an inventive concept.

20.     WebMD infringing **U.S. Patent No. 11,972,865** claims **1,2,3,4, 9,11,12, and 13** and **U.S. Patent No. 11,972,051** claims **1, and 2**. These claims are directed at a specific technical solution, not an abstract idea, and even if deemed abstract, they recite an inventive concept that transforms diagnostic reasoning into a concrete, computer-implemented process. Accordingly, the patent is valid under §101, and WebMD's invalidity challenge fails.

21.     In the present motion to dismiss, Defendants have **not identified or relied upon any prior-art references** to challenge the validity of the asserted patents—**U.S. Patent Nos. 9,536,865 B1 and 9,536,051 B1**. The absence of any such citation, despite their earlier opportunity, indicates that Defendants effectively concede there is **no prior art that anticipates or renders the claimed inventions obvious** under 35 U.S.C. §§ 102–103.

22.     For the Court's convenience and completeness of the record, Plaintiff respectfully directs the Court to the updated **Patent Validity Analysis (Exhibit 32.2)**, which consolidates and expands the evaluation of both patents and demonstrates that the claimed diagnostic-ranking logic is novel, non-obvious, and fully compliant with § 101 as confirmed by the USPTO's 2024 allowance.

## IV. PROCEDURAL BACKGROUND

23.     In opposing Plaintiff's prior motion for preliminary injunction in the Middle District of Georgia, WebMD submitted the sworn Declaration of Abdallah Abuhussein (ECF 40-2, M.D.

Ga.), asserting that ███████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████ Defendants now rest on the same factual premise in seeking dismissal

of the copyright, trade-secret and patent claims, yet they have not re-attached or

acknowledged that declaration in this Court. That omission cannot shield them from Rule

12(d). The Abuhussein Declaration is part of the transferred record and constitutes

extrinsic evidence previously offered by Defendants to dispute Plaintiff's factual

allegations. Under settled law, a motion to dismiss may not rely on such material without

conversion to summary judgment. See *Fed. R. Civ. P.* 12(d); *Mele v. Fed. Reserve Bank of

N.Y.*, 359 F.3d 251, 255 n.5 (3d Cir. 2004); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d

1410, 1426 (3d Cir. 1997). Because Defendants' own sworn testimony contradicts their

present assertions, factual disputes exist that must be resolved through discovery—not on

a Rule 12(b)(6) motion.

**24.**    In addition, Defendants have **failed to disclose** ██████████████████████

███████ that provided technical or integration services for WebMD's Symptom Checker

between **2018 and 2025**, which Plaintiff reasonably believes to be **Thoughti Inc. or its

affiliates**. Any such services would necessarily involve and reproduce the **same protected

expression** embodied in Plaintiff's database and source code. By **withholding the identity**

██████████████████ while simultaneously asserting that Plaintiff failed to identify the

precise source of copying, Defendants engage in **procedural gamesmanship of the most

egregious kind**, effectively shielding the conduit of misappropriation from judicial scrutiny.

25.     Moreover, while WebMD's **opposition to Plaintiff's preliminary injunction motion** explicitly acknowledged a ████████████████, its present **Motion to Dismiss** conspicuously ████████████████████ **OpenAI**, despite clear evidence of such integration visible through the "inspect" feature of WebMD's website backend. This omission is material, as it conceals the very mechanism through which Plaintiff's protected data structures were replicated.

26.     Defendant's omission of the **Abuhussein Declaration** in its present filing is highly significant. That declaration—submitted by WebMD's Senior Director of Engineering—stated that WebMD's engineers "never met or communicated with Thoughti personnel" and that "████████████████████████████████████████" By now refusing to cite or rely on that same declaration, Thoughti appears either to **distance itself from a previously filed false or inconsistent statement** or to **concede the accuracy of Plaintiff's timeline**, which the declaration in fact corroborates. The *Abuhussein Declaration*, when read in conjunction with **Exhibit A (**Case Timeline of Events, see ECF 59—26), validates nearly every factual sequence Plaintiff has alleged, including the period of Thoughti's access to the Doctor AI database and WebMD's subsequent deployment of the infringing "Symptom Checker."

27.     Moreover, Plaintiff's **Third Amended Complaint ("TAC")** includes **John Doe 1 (believed to be OpenAI, Inc.)**, whose identifiers appear in WebMD's own website "inspect" features, linking the current system to the unauthorized use of Plaintiff's proprietary database and source code. By **omitting any reference to the Abuhussein Declaration**, Defendant either implicitly concedes its truth or seeks to **disassociate from clear**

**documentary evidence** showing that WebMD's platform continues to infringe Plaintiff's **copyrights, trade secrets, and patented diagnostic computation steps**—steps made possible only through unauthorized access to Plaintiff's protected data and code.

28. In **Exhibit 44.1 (see ECF 122-3)**, the returned JSON includes the entries "model": "saas-openai-gpt-4o-mini" and "prompt_func_name": "conditions_renderer_v2". This metadata is significant. While many large-language-model (LLM) APIs include a simple "model" field (e.g., "gpt-4o" or "gpt-4-turbo"), they **typically do not expose environment-specific prefixes** such as "saas-openai-…" or disclose **internal function-call identifiers** like "conditions_renderer_v2". Public API responses are usually abstracted to prevent users from identifying the service's internal orchestration or proprietary workflow.

29. The simultaneous presence of a **custom model-origin tag** and an **internal function name** reasonably suggests that the call may have been executed through **WebMD's own server-side orchestration layer**—for example, a wrapper or microservice that invokes OpenAI's GPT-4o-mini model behind the scenes.

The "saas-openai-gpt-4o-mini" string further implies a **software-as-a-service (SaaS)** deployment, **possibly integrated with WebMD's infrastructure for inference handling or hybrid hosting**, where WebMD retains partial control over data flow and model invocation.

30. Defendants ask this Court to dismiss Plaintiff's patent infringement claims while refusing to disclose the very facts that would determine liability: ███████████████

████████████████████████████████████████████

████████████████████████████████. Instead, Defendants rely on

conclusory denials and evasive testimony from a low-level data manager while withholding executive-level declarations.

**31.**    The law is clear: ███████████████████████ **does not absolve liability.** See *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015) (en banc). Defendants' Symptom Checker continues to collect patient symptoms, transmit them to a database, and return an "ordered list of potential conditions"—precisely the process claimed in U.S. Patent No. 11,972,865 ("the Kabir Patent").

**32.**    Plaintiff further notes that **Claim 1 of the '051 Patent** is intentionally **more detailed and comprehensive**, reflecting advice from technical and patent experts during prosecution to secure **broader yet airtight protection** and prevent potential infringers— such as WebMD—from evading liability through minor algorithmic variations. The '051 Patent was therefore included not as a redundant claim set, but to **complete the evidentiary record** and establish continuity of invention from the original conception through the continuation lineage that culminated in the '865 Patent. In doing so, Plaintiff demonstrates that both patents protect the same inventive diagnostic logic implemented through the same underlying data-mapping and ranking mechanisms, differing only in claim scope and integration of prevalence and life-threatening condition parameters.

**33.**    The Kabir Patent supplies that missing metacognitive framework **(Exhibit 47, see ECF 122-5)**, centered precisely on the ranking of differential diagnoses. The ranking step is the critical innovation. Any system that attempts to rank differential diagnoses necessarily

practices the patented method, because there is no alternative approach outside the claimed invention when using symptom–disease mapping.

## V. COPYRIGHT INFRINGEMENT AND TRADE SECRET MISAPPROPRIATION CLAIMS

34.     **Doctor AI Cognitive Diagnostic Reasoning Database and Source Code** was filed with the **U.S. Copyright Office** on **November 5, 2025, and copy right granted [case number 1-15032919121 (Exhibit 94, see ECF 121-2)]**.

35.     Plaintiff's Doctor AI Cognitive Diagnostic Reasoning Database and Source Code is fully registered with the U.S. Copyright Office as of November 24, 2025 (Exhibit 94), satisfying 17 U.S.C. § 411(a); prior application materials in Exhibit 75 are now superseded and remain only as background documentation.

36.     **See Exhibit 75, Sub-Exhibit E**, which **assigns all copyrights and trade secrets to Dr. Azad A. Kabir**, confirming his sole ownership and standing to assert the intellectual-property rights at issue.

37.     The registration also provides **prima facie evidence of ownership** of an original, independently created work fixed in a tangible medium, consistent with the Supreme Court's standard in **Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340 (1991)**.

38.     Plaintiff alleges that Thoughti's misappropriation enabled WebMD to implement the same patented diagnostic steps, rendering both entities liable for the resulting infringement and misuse of Plaintiff's copyrighted and trade-secret materials. Accordingly, Plaintiff incorporates by reference the Introduction (pp. 4–6) and the subsequent sections of Plaintiff's Opposition to Thoughti's Motion to Dismiss (ECF 104), as listed below:

a)      **Procedural Background** – *To avoid repetition and to conserve page limits, Plaintiff refers the Court to Plaintiff's Opposition to Thoughti's Motion to Dismiss (ECF 104), submitted on January 7, 2025, at pages 12–13, Section III ("Procedural Background"). Plaintiff incorporates that section by reference as though fully set forth herein.*

b)      **Timeline Evidence from Exhibit A, Exhibits 3–5, Exhibit 47, and the Abuhussein Declaration** –*Plaintiff refers the Court to pages 13–15, Section IV ("Timeline Evidence from Exhibit A, Exhibits 3–5, Exhibit 47, and the Abuhussein Declaration") of Plaintiff's Opposition to Thoughti's Motion to Dismiss (ECF 104). Plaintiff incorporates that discussion by reference in full.*

*c)*      **Governing Standard under Rule 12(b)(6)** – *Plaintiff refers the Court to page 15, Section V ("Governing Standard") of Plaintiff's Opposition to Thoughti's Motion to Dismiss (ECF 104), which sets out the Rule 12(b)(6) standard adopted by this Court and the Third Circuit. That statement of the legal standard is incorporated here by reference.*

d)      **Factual Background (Thoughti's Access, NDA Misrepresentations, and LinkedIn Admissions)** – *Plaintiff refers the Court to pages 16–19, Section VI ("Factual Background") of Plaintiff's Opposition to Thoughti's Motion to Dismiss (ECF 104). The factual narrative— including Thoughti's early access, concealment, NDA execution history, and LinkedIn admissions—is incorporated by reference as though fully stated herein.*

e)      **Argument: Claims Are Plausibly Stated under Twombly/Iqbal** – *Plaintiff refers the Court to pages 19–22, Section VII ("Argument — Claims Are Plausibly Stated Under Rule 12(b)(6)") of Plaintiff's Opposition to Thoughti's Motion to Dismiss (ECF 104). Plaintiff*

*incorporates that analysis by reference, including the plausibility arguments under Twombly and Iqbal.*

*f)* **DTSA and Copyright Elements Satisfied — Including Evidence from WebMD's Own Abuhussein Declaration** *– Plaintiff refers the Court to pages 22–28, Section VIII ("DTSA and Copyright Statute Satisfied by WebMD's Own Declaration") of Plaintiff's Opposition to Thoughti's Motion to Dismiss (ECF 104). That discussion—including WebMD's admissions in the Abuhussein Declaration—is incorporated here as though fully set forth.*

**g)** **Timeliness under the DTSA and NJTSA (Discovery Rule and Continuing-Use Doctrine)** *– Plaintiff refers the Court to pages 28–29, Section IX ("Plaintiff's Claims Are Timely Under the DTSA and NJTSA") of Plaintiff's Opposition to Thoughti's Motion to Dismiss (ECF 104). Plaintiff incorporates that timeliness analysis by reference.*

## VI. DEFEND TRADE SECRETS ACT (DTSA) AND COPYRIGHT STATUTE SATISFIED BY DEFENDANTS' OWN DECLARATION

**39.** Plaintiff's trade secrets consist of specific, identifiable components of the Doctor AI diagnostic framework that are not discernible from any public source. These include: **(1)** the symptoms disease mapping database; **(2)** the proprietary *intersection-mapping algorithm* that computes diagnostic probabilities from unstructured symptom inputs; **(3)** the *prevalence-weighting tables* that adjust diagnostic rankings by quantifiable measures of disease frequency, severity, clinical relevance, and mortality; and **(4)** the confidential *diagnostic-ranking formula* that integrates those weighted intersections to generate a prioritized differential diagnosis. Collectively, these components form a unique

computational architecture that transforms nominal symptom data into clinically ranked outcomes—a capability unattainable through conventional decision-tree or large-language-model systems. The underlying numerical weightings, normalization constants, and calibration procedures were independently developed by clinical experts, never published, and maintained on password-protected servers accessible only to authorized collaborators under non-disclosure agreements. The schema's hierarchical ranking of diseases by prevalence, severity, relevance, and mortality risk reflects proprietary formulas and logic that Plaintiff developed and maintained as confidential. These components constitute trade secrets under 18 U.S.C. § 1839(3) because they derive independent economic value from not being generally known and were protected through NDAs, restricted-access systems, and confidentiality agreements.

## VII. ARGUMENT

40.    **Count I – Copyright infringement necessarily entails replication of protected expression (17 U.S.C. § 106, 501):** Plaintiff alleges ownership of an original work titled *Doctor AI Cognitive Diagnostic Reasoning Database and Source Code* (Reg. No 1-15032919121, approved, Exhibit 94). The complaint plausibly alleges:

(1) ownership of the copyrighted compilation; (2) Defendant's access to that work through NDA-protected credentials; and (3) substantial similarity and copying, which is inferred from the functional identity between Plaintiff's rank-ordered diagnostic logic and WebMD's subsequent implementation. This satisfies the substantial-similarity standard because copyright protects the *selection, coordination, and arrangement* of data and logic structures. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348–52 (1991). The Third

Circuit likewise holds that copying may be inferred when the defendant appropriates the protected expressive structure or arrangement. *Tanksley v. Daniels*, 902 F.3d 165, 174–75 (3d Cir. 2018). These allegations easily satisfy the Rule 12(b)(6) plausibility requirement under *Twombly* and *Iqbal* and preclude dismissal at the pleading stage.

41. **Count II – Trade-Secret Misappropriation pursuant to DTSA, 18 U.S.C. § 1836 et seq.; NJTSA:** Plaintiff identifies trade secrets, including the prevalence-weighted ranking, severity scales, and intersection logic of the Doctor AI database, all of which were maintained under non-disclosure agreements and protected by password-restricted servers. All contractors and personnel executed confidentiality obligations, including retroactive NDAs where necessary **(see Exhibit 84).**

a) **Improper Means:** Thoughti's CTO obtained access under a false alias ("Niel Pro") and misrepresented his corporate affiliation, satisfying 18 U.S.C. § 1839(6)(A).

b) **Use:** LinkedIn communications by Thoughti's CEO admit (Exhibit 3.4.5, see **ECF 101-2**) use of the confidential knowledge to assist WebMD's Symptom Checker.

c) **Interstate Commerce:** The product operates nationwide via WebMD.com.

d) These allegations mirror those upheld in *Syntel v. Trizetto*, 68 F.4th 792 (2d Cir. 2023), and *BladeRoom v. Emerson*, 331 F. Supp. 3d 977 (N.D. Cal. 2018), satisfying DTSA and NJTSA pleading elements.

42. **Count III. Plaintiff Has Plausibly Alleged Direct Infringement Under 35 U.S.C. § 271(a):** Defendants' own declarant, Abdallah Abuhussein, admitted under oath that [Abuhussein Decl.]:

a)    In April 2018, WebMD launched a Symptom Checker "incorporating the usage of a

 . This admits **access** to computational engine capable of performing the patented mapping, intersection, and ranking steps—precisely the kind of access that supports both infringement and misappropriation plausibility.

b)    The system transmits patient symptoms and receives an "." The

shows **similarity** to the patented method and satisfies the "ordered list" limitation found in Claims 9, 11, and 12 of the '865 Patent [Exhibits 28 (ECF 59-21), 29 (ECF 59-22), 90 (ECF 122-14), and 91 (ECF 122-15)]. The receipt of a rank-ordered set of diagnoses is the core step that no prior WebMD system performed before 2018.

c)    He is aware that the Symptom Checker "has been accused of infringing U.S. Patent No. 11,972,865." This demonstrates **knowledge**, and the phrasing necessarily acknowledges **ongoing use**, because the declarant describes present-tense awareness during operation of the accused system. Under Fed. R. Evid. 801(d)(2), this constitutes an admission of a party-opponent.

d)    The term directly tracks the language of the asserted claims (including the required mapped associations, intersection logic, and final rank-ordering), and therefore supports **direct use**, **induced infringement**, and **ongoing exploitation of the trade-secret-derived mapping architecture** identified earlier.

e)    For a complete element-by-element mapping demonstrating how each limitation of the asserted claims is practiced by the Symptom Checker, Plaintiff refers the Court to

Section III (Validity of the Kabir Patent), which provides the corresponding claim-chart analysis.

43.     Whether the functionality █████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████. This satisfies the Federal Circuit's standard for "use" under 35 U.S.C. § 271(a), as articulated in *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015) (en banc), and *Travel Sentry, Inc. v. Tropp*, 877 F.3d 1370, 1381 (Fed. Cir. 2017).

44.     **Plaintiff Has Also Plausibly Alleged Indirect Infringement Under 35 U.S.C. § 271(b)–(c):** In addition, Defendants' own statements establish a basis for indirect infringement. WebMD concedes that: "[i]n January 2025, WebMD launched a new version of Symptom Checker utilizing a ████████████████████████████████████ ████████████████████████████████████ The current user interface is virtually unchanged from the previous version, and the ██████████████████████████ is undetectable to the user."

45.     This admission confirms that WebMD ███████████████████████████ ████████████████████████████████. Even if the Court were to accept Defendants' position that the third-party provider is the primary operator, WebMD would remain liable for indirect infringement under §§ 271(b)–(c) ████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████.

**46.** ███████████████████████████████████ **Continuity of Infringing**

**Functionality**

**a)**    Defendants admit that █████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████. The current user interface is virtually

unchanged from the previous version, and the █████████████████████ is

undetectable to the user."

**b)**    This admission is telling. If the identity of ████████████████ had truly altered

the technical operation of the system, one would expect a different user experience and a

different diagnostic output. Instead, the user interface and the quality of the ranked

differential diagnosis list remained materially the same. This continuity underscores two

critical points:

**I.** █████████████████████████████████████████████████

████████████████████████████████████████████ which

directly implicates the Kabir Patent's claims.

**II.** █████████████████████████████████. As the Federal Circuit has held, liability

attaches where the accused product continues to perform each step of the claimed

method. See *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir.

2015) (en banc). ██████████████████████████████ makes no legal

difference—the infringing steps are directed and controlled by WebMD and presented as

its own product.

**III.** Defendants' own description thus confirms that the "new" Symptom Checker is not a fundamentally different product but simply the same infringing process with a different contractor behind the curtain. The motion to dismiss cannot obscure this continuity.

47.    WebMD incorrectly asserts that Plaintiff's allegations are merely conclusory under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). In reality, the **Third Amended Complaint** and supporting exhibits provide detailed, fact-specific allegations satisfying every element of Plaintiff's claims. For **direct patent infringement**, Plaintiff identifies the protected diagnostic-ranking algorithm ('865 and '051 Patents), the accused WebMD Symptom Checker, and the precise overlapping computational steps [(Exhibits 28 (ECF 59-21), 44.1 (ECF 122-3), 90 (ECF 122-14), and 91 (ECF 122-15)}. For **copyright infringement**, Plaintiff alleges ownership of the registered database and code (Exhibit 75 E) and demonstrates substantial similarity through JSON structures and ranking outputs that replicate Plaintiff's protected expression (Exhibits 44.1, 90, and 91). For **trade secret misappropriation under the DTSA**, Plaintiff pleads (1) ownership of defined trade secrets, including the intersection-mapping algorithm and prevalence-weighting tables; (2) acquisition by improper means through Thoughti's unauthorized access to Plaintiff's servers [Exhibits 78 (ECF 122-11), 79 (ECF 122-12)]; and (3) continuing use by WebMD and its collaborators. These detailed factual allegations more than satisfy the plausibility threshold required by *Twombly* and *Iqbal*.

48.    **WebMD's 2018 to 2025 switch mirrors the Kabir patented model:** The record demonstrates that WebMD shifted from a rigid decision-tree system to a flexible database-

driven system that is functionally indistinguishable from the Kabir patent (Doctor AI) [Exhibits 90, 91].

49. **Exhibits 28, 29, 90, and 91** provide direct evidence that WebMD's system mirrors the Kabir patented model. ████████████████████████████████ ████████████████████████████████████████████ ████████████████████ Both independent claim chart analyses confirm that these outputs included ranked diagnostic lists—the central element of Plaintiff's asserted patent claims. Under 35 U.S.C. § 271, WebMD's use of such rank-ordered diagnostic outputs constitutes direct infringement, regardless of whether the underlying computation was performed ████████████████████████████.

50. **Webpage analytics inspection** – A standard feature of software inspection (right-click → "inspect") confirms that WebMD's webpage is linked to an underlying **database structure** connecting symptoms directly to diagnostic outputs (Exhibits 28, 44.1, 90, and 91).

51. **Method requirement** – Whenever symptoms are linked to differential diagnoses in this manner, the data can only be analyzed using the **Kabir patented method** (**Exhibit 12, see ECF 59-10**).

52. **WebMD's failure to rebut evidence strengthens the inference of copying**: Plaintiff has submitted, under seal, a detailed patent validity analysis and prior art comparison. Because this material contains trade secrets and confidential technical information, it is not disclosed publicly. The sealed submission demonstrates that Plaintiff

has reviewed each piece of prior art cited by Defendants and shows that none bears any substantive relationship to the Kabir Patent.

**53.** WebMD has presented no evidence disproving Plaintiff's claim of trade secret misappropriation and change to the Kabir system in 2018.

**54.** **Inference of Copying from Access + Similarity:** *Well-established precedent recognizes that copying may be inferred where a defendant had access to the protected material and the accused system exhibits substantial similarity. In the trade-secret context, courts permit an inference of use when the defendant had access to the secret and the resulting design or output reflects materially similar features. Stratienko v. Cordis Corp., 429 F.3d 592, 600–01 (6th Cir. 2005). Copyright law applies the same principle: access combined with substantial similarity gives rise to a presumption of copying. Three Boys Music Corp. v. Bolton, 212 F.3d 477, 485 (9th Cir. 2000).* These authorities support the inference that Thoughti's access to the Doctor AI system—obtained through NDA-protected development work (Exhibits 84, 78-79)—combined with WebMD's later outputs that mirror the structure, ranking logic, and diagnostic architecture of the Kabir patented model, plausibly demonstrates copying and misuse at this stage of the litigation. This inference reinforces the plausibility of Plaintiff's copyright, trade-secret, and patent-misuse allegations under Rule 12(b)(6).

**55.** Plaintiff recently discovered new forensic indicators showing overlap between WebMD's Symptom Checker and "Athenahealth Symptom Checker" within WebMD's webpage code (Exhibit 93, see **ECF 122-17**). Plaintiff previously discussed Athenahealth integration with Mr. Patkar during his residency in Plaintiff's home, and Exhibit 93 now

shows both Athenahealth and WebMD referenced together in WebMD's code. This supports the possibility that Athenahealth served as the undisclosed third party referenced in the Abuhussein Declaration, potentially acting as ███████████████ Thoughti and WebMD from 2018 to early 2025. Such ████████████ could also explain why engineers from Thoughti and WebMD now claim they "did not know each other."

56.    Evidence already in the record demonstrates serious inconsistencies requiring forensic-level discovery. Thoughti operated as an LLC when it began working for Plaintiff in 2017 (ECF No. 104-2 ¶ 3, filed Nov. 3, 2025), but immediately after entering into possible contact with WebMD or its subsidiary in 2018—as indicated in the Abuhussein Declaration—it converted into a corporation, coinciding with a sudden rise in commercial success (ECF No. 104-2 ¶¶ 3–4; ECF 104-4). This timeline raises substantial questions about whether financial gains were derived from misappropriated components of Plaintiff's Doctor AI system, necessitating a forensic review of WebMD's banking records, financial transfers, invoices, and related accounting materials.

57.    **Plaintiff attaches Exhibit 2 (ECF 151-4) for record-preservation purposes only and does not ask the Court to consider it for Rule 12(b)(6) purposes.** Plaintiff respectfully notes that the previously submitted 136-page opposition (Exhibit 2) contained a fuller factual background and argument. Pursuant to ECF 117, Plaintiff was required to reduce the brief to 30 pages, and certain details may therefore have been omitted inadvertently. Plaintiff is **not requesting leave to supplement or expand** the present brief. **Exhibit 2 is included solely for record preservation**, and Plaintiff does **not** request that

the Court review Exhibit 2 unless the Court independently determines supplementation is required to avoid prejudice.

## VIII. REQUESTED RELIEF AND NEXT STEPS

**58.**    Pursuant to Rule 12(b)(6), Plaintiff respectfully requests that the Court **deny Defendant WebMD's Motion to Dismiss in its entirety** because the operative pleadings plausibly allege each element of copyright infringement, trade-secret misappropriation, patent infringement claims, and related claims. **Relief Requested: a) Deny** WebMD's Motion to Dismiss; **b)** Should the Court independently determine that additional clarification is necessary to avoid prejudice, Plaintiff respectfully requests that any further amendment be permitted pursuant to Fed. R. Civ. P. 15(a)(2); **c)** If converted under Rule 12(d), permit limited discovery under Rule 56(d) to include forensic review of relevant electronic and financial records necessary to verify Defendants' assertions; **d)** Permit substitution of **John Doe 1** with **OpenAI, Inc.** pursuant to **Fed. R. Civ. P. 15(c)** and **19(a)**, based on the unrebutted evidence in *Exhibit 44.1* showing OpenAI's direct backend role in WebMD's Symptom Checker; and **e)** Grant such other relief as the Court deems just and proper.

## IX. CONCLUSION

**114.**    The expert opinion of Patrick Cummins, Esq. (Exhibit 85, see ECF 122-13) confirms that U.S. Patent No. 11,972,865 satisfies the *Alice/Mayo* framework for patent eligibility under 35 U.S.C. §101. As Mr. Cummins's analysis demonstrates, the '865 Patent claims are directed to a specific technological improvement in medical database architecture—

namely, the structured computation and ranking of differential diagnoses based on disease

prevalence—rather than an abstract idea.

**115.**    Plaintiff has already submitted a comprehensive **254-page validity analysis**

(updated Exhibit 32.2, see ECF 107-1, also filed under seal), which fully addresses the §101

framework and confirms the technological nature of the claims.

**116.**    Defendants lack standing to seek dismissal of the Third Amended Complaint on the

grounds they assert. By their own sworn declaration, Defendants ██████████████████

████████████████████████████████████████████████████

██████████████████████████████. Such a position cannot support

dismissal; at most, it presents factual disputes that must be resolved through discovery

and forensic examination. Defendants cannot simultaneously disclaim knowledge of how

the patented steps are performed while moving to dismiss based on those very steps. This

contradiction highlights their bad-faith tactics and procedural gamesmanship. At this

preliminary stage, Plaintiff is entitled to plead in the alternative under Rule 8(d)(2), and any

factual disputes as to ██████████████████████████████████████

not grounds for dismissal. Plaintiff has plausibly alleged infringement of a valid patent,

supported by detailed claim charts, expert analyses, Defendants' own admissions, and

ChatGPT-generated outputs that constitute self-incriminating evidence of infringement.

**117.**    When WebMD submitted the sealed *AbuHussein Declaration*, it continued to

conceal the identity of the ████████████████████████████████████

████████████████████████. Even in the unredacted version, WebMD ██████

████████████████████████████████████████████████████ in

the redacted public-facing version— ███████████████████████. This selective redaction and failure to disclose ███████████████ were calculated to prevent discovery of the operational and financial connections among **Thoughti**, ██ ████████████████, most likely Athenahealth EMR [(ECF 70-3 and Exhibit 93 (ECF 122-17)], and **WebMD**. By doing so, both defendants can technically claim that they never "provided services to each other," even though each engaged the same concealed ████████████ to exchange data, algorithms, and outputs. **WebMD's silence and failure to dispute the involvement of these entities constitutes a meaningful admission by omission**.

**118.**    See Plaintiff's opposition to Thoughti's Motion to Dismiss (ECF 104) submitted January 7, 2026, which documents the chain of access and fraudulent concealment by Thoughti's CTO establishing the conduit through which WebMD acquired the misappropriated data. **Justice cannot be served, and this action should not be dismissed without permitting discovery from these ██████████.**

**Respectfully submitted,**

*Azad Kabir*

**/s/ Azad Kabir**

Azad Kabir, MD

Pro Se Plaintiff; 1120 Beach Blvd, Biloxi, MS 39530

Email: azad.kabir@ddxrx.net, Tel: (228) 342-6278

**Dated:  January 7, 2026**

**CERTIFICATE OF SERVICE**

I hereby certify that on **January 7, 2026**, I filed the foregoing **Plaintiff's Opposition to WebMD's Motion to Dismiss (105)** with the Clerk of Court using the **ADS/CM/ECF** system, which will send notification of such filing to all counsel of record.

Respectfully submitted,

**/s/ Azad Kabir**

Azad Kabir, MD

Pro Se Plaintiff

**Dated:  January 7, 2026**

# Exhibit 75:

**U.S. Copyright registration applied on November 5, 2025 — including the required application form, deposit copies, and exhibits.**

Home | | My Profile | Help | Contact Us | Log Out |

**Check Registration Case Status**
- Open Cases
- Working Cases
- All Cases
- My Company's Cases
- Status Definitions
- Search My Cases
- My Applications
- My Company's Applications

**Copyright Registration**

**Register a Work**
Standard Application
*This Application may NOT be used to submit "Unpublished Collections." You must select "Register a Group of Unpublished Works" below to register multiple unpublished works*

**Other Registration Options**
*Note: Restrictions Apply*
Register Certain Groups of Published Works
Register a Group of Photographs
Register a Group of Unpublished Works
Register One Work by One Author
Correct or Amplify an Existing Registration

**Other Services**
*Note: Substantial Fees Required*
Preregistration of Certain Types of Work

**Miscellaneous**
Use an Existing Template
Organization/Deposit Account

**Additional Copyright Services**
Access Copyright Office Information
- Ask a Question
- Read Circulars
- Search Online Records

## Electronic Copyright Office (eCO)

### Welcome, Patrick!

- Please disable your browser's pop-up blocker
- What's new in eCO?
- For copyright registration information, instructions, helpful tips and FAQs, click here
- If you received a Notice for Mandatory Deposit for an electronic work and need more information or help, click here

### Open Cases

| Case # | Status | Opened | Title of Work | Vol/Num/Issue | Month Year | Type of Work | Appl. Format | Appl. Form | Fee Paid | Upload Status | Closed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1-15032919121 | Open | 11/05/2025 | Doctor AI: Cognitive Diagnostic Reasoning Database Schema | | | Literary Work | Standard | | $865.00 | Complete | |
| 1-15032919041 | Open | 11/05/2025 | Doctor AI: Cognitive Diagnostic Reasoning Database and Source Code | | | Literary Work | Standard | | $865.00 | Complete | |

---

### *eCO information*

**Notice**

The government is currently funded through September 30. In case of a lapse in government funding, the U.S. Copyright Office will be closed, as will be the Library of Congress. Registration submissions will be accepted for the purpose of securing date of receipt but will not be processed. Website updates and all normal business activity will resume when the government reopens.

If you would like to file a copyright registration or submit a document recordation, our online systems are available. Filing your registration claim now will help ensure the earliest possible effective date of registration, although submissions will not be processed until the Copyright Office reopens.

IMPORTANT NOTE: You may register up to 10 unpublished works on the same application. To do so, YOU MUST SELECT the link for "Register a Group of Unpublished Works." Click here if you need help finding this link. Click here to watch a video that provides step-by-step instructions for completing the application for a "Group of Unpublished Works."

The "Standard Application" MAY NOT BE USED to register a "collection" of unpublished works. If you submit 2 or more unpublished works on the "Standard Application" the Copyright Office may register only 1 of your works and remove the remaining works from the claim. To register those works you will need to resubmit them using an appropriate application form.

The eCO Registration System will be offline every weekend from 10:00 PM Saturday until 6:00 AM Sunday (Eastern Time) for scheduled maintenance.

Privacy Act Notice: Sections 408-410 of title 17 of the United States Code authorize the Copyright Office to collect the personally identifying information requested on this form in order to process the application for copyright registration. By providing this information you are agreeing to routine uses of the information that include publication to give legal notice of your copyright claim as required by 17 U.S.C. § 705. It will appear in the Office's online catalog. If you do not provide the information requested, registration may be refused or delayed, and you may not be entitled to certain relief, remedies, and benefits under the copyright law.

Take Our Survey!

**U.S. Copyright Application – Doctor AI Diagnostic Database and Source Code**

**1. Title of Work:**

**Doctor AI: Cognitive Diagnostic Reasoning Database and Source Code**

Alternative Titles: *ClinicalAssist Cognitive AI Diagnostic Engine*, *DDxRx.com Knowledge Graph*, *Doctor AI Cognitive Diagnostic Framework*

---

**2. Nature of Work:**

The following excerpts are provided for copyright registration purposes only. They illustrate the structure and logic of the Doctor AI system but omit all proprietary prevalence values, weighting coefficients, and calibration constants, which remain confidential trade-secret material.

This submission covers two principal components:

**(a) Computer Program (Source Code):**

Proprietary algorithms, data structures, and executable logic implementing the patented reasoning process for symptom–disease mapping, intersection, and rank-ordering of differential diagnoses.

The program also confirms or rules out top-ranked diagnoses through a weighted, per-symptom algorithm and generates clinician-style encounter notes summarizing confirmed findings, diagnostic reasoning, and treatment-decision recommendations.

**(b) Structured Database (Confidential Compilation / Trade Secret):**

A curated and clinically validated database of symptom–disease relationships containing proprietary prevalence, severity-of-illness, clinical-relevance, and mortality-risk parameters. The database supports the confirm-and-treat logic by linking symptoms, diseases, and corresponding management actions. Weighted tables, diagnostic hierarchies, and structured metadata enable cognitive diagnostic computation and automated clinical-note generation.

All quantitative weights and treatment-decision matrices are maintained as **trade secrets** and are redacted from the deposit under **37 C.F.R. § 202.20(c)(2)(vii)(A)(2)**. All withheld parameters are retained under secure custody and available to the Office upon request under protective conditions.

Together, these works form the core of the **Doctor AI Cognitive Diagnostic System**, protected under **U.S. Patent No. 11,972,865 B1** ("High Probability Differential Diagnoses Generator and Smart Electronic Medical Record").

This copyright registration complements but does not duplicate the protection afforded under U.S. Patent No. 11,972,865 B1. Functional concepts disclosed in that patent are claimed under patent law; this registration covers expressive implementation only.

---

**3. Author Information:**

**Author:** Dr. Azad Alamgir Kabir, MD MSPH

Address: 1120 Beach Blvd, Biloxi, MS 39530 USA

Email: azad.kabir@ddxrx.net

Citizenship: United States

Creation completed: 2011–Present

This work is not a work made for hire. Dr. Azad Alamgir Kabir is the sole author and owner.

---

**4. Year of Start and Completion: 2011 to Present**

Development of the database began in November **2011** and continued through **2025**, with ongoing updates. The system is designed as a **continuously evolving clinical knowledge base**, integrating new information from **clinical trials, peer-reviewed literature, and emerging disease data**. As new medical conditions are identified and existing disease characteristics change, the database is revised to reflect updated **associations, severity indices, prevalence patterns, and mortality risks**.

For example, the emergence of **COVID-19** represented a previously unknown diagnosis that required the addition of new disease profiles, symptom associations, and outcome parameters. This adaptive update process ensures that the database remains current with the latest medical knowledge and real-world evidence.

---

**5. Description of Work:**

**Section 1 — Rank-Ordered Differential-Diagnosis Generation**

**Overview.**

The **Doctor AI** system delivers rank-ordered differential diagnoses derived from its curated relational database and patented intersection logic.

The database contains **over 2,200 curated clinical inputs** (signs, symptoms, laboratory, and radiological findings) cross-linked to **approximately 15,000 diagnostic entities**. Each disease and symptom name has been linguistically standardized for computational precision—hyphenation, capitalization, punctuation, and syntax were manually harmonized so that the intersection logic executes reliably within PHP, JavaScript and Python modules. This editorial curation constitutes original authorship and differentiates the database from unprocessed public-domain terminology.

**Functional scope illustrated by the excerpts.**

- **Mapping Logic:** Each symptom is mapped to a curated list of candidate diseases, pre-ranked by prevalence, severity, and clinical relevance.

- **Intersection Logic:** Multiple symptom lists are computationally intersected to isolate diseases appearing in more than one list.

- **Ranking Algorithm:** The intersected diseases are scored using normalized weighting factors for prevalence, severity, relevance, and mortality risk to produce a transparent, auditable differential-diagnosis order.

- **Display Layer:** The ordered list is rendered to the user interface, showing the strength of association between the patient's reported findings and each diagnostic hypothesis.

**Trade-secret redactions.**

In accordance with **37 C.F.R. § 202.20(c)(2)(vii)(A)(2)**, numerical weighting values, prevalence data, calibration constants, and proprietary ranking coefficients are **redacted**. Only representative schema definitions, naming conventions, and illustrative pseudo-code segments are provided to demonstrate authorship and fixation for copyright purposes.

**Confidentiality notice:**

*"Database & Algorithm Deposit – Confidential Demonstrative Excerpt (Trade-Secret Values Redacted). Proprietary coefficients and clinical parameters omitted."*

**Section 2 — Code to Confirm or Rule-Out Top-Ranked Differential Diagnoses; Weighted Per-Symptom Algorithm; AI-Generated Encounter Notes (PHP & JavaScript)**

**Overview.**

This section contains *representative excerpts* of PHP and JavaScript modules that (i) confirm or rule out the system's top-ranked differential diagnoses using a weighted, per-symptom algorithm and (ii) generate clinician-style encounter notes from patient-reported findings. The excerpts illustrate expressive structure and logic only; proprietary numerical parameters and templates are withheld.

**Functional scope illustrated by the excerpts:**

- **Confirm/Rule-Out Engine (PHP):** Applies per-symptom weights and tie-break rules to prompt targeted follow-up questions for the top differentials; updates rank order based on responses and documented findings.

- **Weighted Mapping Utilities (PHP/JS):** Normalizes symptom strings, applies curated token rules (hyphenation/case/apostrophes), and safely maps inputs to canonical identifiers required for intersection logic.

- **Real-time UI Logic (JavaScript):** Drives client-side question flow, captures responses, and renders ranked updates without exposing backend coefficients.

- **Encounter Note Composer (PHP):** Renders a structured HPI/ROS/Assessment-&-Plan using system-generated text blocks aligned to the confirmed differential list and documented red-flags.

**Trade-secret redactions.**

Pursuant to **37 C.F.R. § 202.20(c)(2)(vii)(A)(2)**, the following are redacted from the excerpts: numeric weights, prevalence tables, calibration constants, threshold values, and full text templates for encounter notes. Disclosure of these values is **not required** to establish authorship and fixation of the code.

**What excerpts show (without secrets):**

- Function and class names, module boundaries, method signatures, and representative control flow for the confirm/rule-out pipeline.

- Canonical string-handling rules used to ensure precise mapping across the database (e.g., punctuation and case normalization for disease/symptom names).

- Skeleton rendering of the encounter-note composer (section headings and placeholder tokens), demonstrating the original expressive structure of the note generator.

**Confidentiality notice:**

*"Source Code Deposit – Confidential Demonstrative Excerpt (Trade-Secret Values Redacted). Proprietary coefficients, prevalence tables, and templates omitted."*

---

These materials collectively demonstrate original authorship, structure, and logic of the Doctor AI Cognitive Diagnostic Reasoning System, protected as both literary and audiovisual computer-program expression under 17 U.S.C. § 101 et seq.

The originality lies in the specific selection, coordination, and arrangement of diagnostic relationships—reflecting medical judgment and algorithmic purpose rather than random or alphabetical listing.

This registration covers the original authorship in source code and database schema only. Proprietary numerical parameters, prevalence tables, and clinical-validation datasets are withheld under 37 C.F.R. § 202.20(c)(2)(vii)(A)(2) as trade secrets. Only redacted excerpts sufficient to identify authorship are included.

This work consists of two interrelated elements:

**(a) Doctor AI Source Code (Exhibit B)**

1. Programming language: PHP, Python, and with JavaScript frontend modules.

2. Implements the stepwise algorithm disclosed in Claim 9 et seq. of U.S. Patent No. 11,972,865 B1:

    a. **Collection of structured and unstructured patient inputs** (symptoms, signs, labs).

    b. **Mapping each symptom to one or more candidate diseases** in master differential-diagnosis tables.

    c. **Isolating common disease data** across multiple symptom mappings.

    d. **Ranking intersected diseases using weighted frequency**, prevalence, severity, and clinical relevance.

    e. Generating a ranked differential diagnosis and graphical report.

    f. **Confirming Top Differentials:** Applies weighted, per-symptom algorithm to re-evaluate high-ranked diseases based on follow-up findings and additional inputs.

g. **Ruling Out Diagnoses:** Dynamically reduces ranking scores for conditions disproven by clinical context or negative responses, marking them as *ruled out*.

h. **Re-ranking:** Continuously recalculates disease probabilities as new information is entered, ensuring the diagnostic order reflects the most current data.

i. **Encounter-Note Generation:** Automatically compiles physician-style documentation (HPI, ROS, Assessment, Plan) summarizing confirmed findings and diagnostic reasoning.

j. **Graphical Output:** Presents final ranked results with visual indicators of diagnostic confidence and association strength.

k. **Audit and Export:** Produces a transparent, auditable record of the diagnostic process and exports structured encounter notes for EHR integration.

3. Includes all core algorithmic logic, ranking engine, database connectors, and interface code.

**(b) Doctor AI Diagnostic Database (Exhibit A)**

1. Structured relational database of symptom–disease associations built from original research.

2. Each symptom table contains 20–30 diseases, pre-ranked according to prevalence, severity, clinical relevance, and mortality risk.

3. Contains proprietary weighting values and normalization constants constituting trade-secret content.

4. Stored in SQL/CSV format; encoded for machine computation and clinical integration.

5. Source materials such as medical textbooks and literature were consulted for factual reference only; no expressive text or protected arrangement was copied; all prevalence parameters and weights were developed de novo by medical experts.

**Statement of Originality:**

This work embodies original authorship in (1) the textual curation and normalization of medical terminology for computational use, (2) the design of relational database schema and field structures, and (3) the arrangement and logic of source-code modules implementing the diagnostic-ranking algorithm. These elements represent independent creative contributions not copied from any prior database or program.

## 6. Type of Authorship:

Computer program text, database schema design, and editorial compilation of standardized clinical terminology for intersection logic to work. Computer program (literary work) and original compilation (database). Original compilation and textual adaptation of clinical terms (standardized expressions of symptom and disease names enabling intersection logic), together with the relational database structure and source code.

This registration covers the original textual and structural expression of curated disease and symptom names, the database schema, and the associated source code. Numerical weighting data, clinical parameters, and prevalence tables remain confidential trade-secret material.

## 7. Rights and Limitations:

The copyright covers:

1. Original source code, scripts, algorithms, and data structures implementing the Doctor AI reasoning engine.

2. Original data selection, coordination, and arrangement of the Doctor AI Database.

**It excludes**:

1. Publicly known disease names and medical facts.

2. Any U.S. government-produced material.

3. Unprotectable ideas or methods already disclosed in the corresponding patent (these remain under patent protection, not copyright).

---

**8. Deposit Material:**

Deposit materials consist of Exhibits A–E, collectively submitted in PDF format:

1. **Exhibit A - Doctor AI – Database Schema Deposit:** Representative data tables schema (symptom → disease mappings) with one full example and obfuscated weighting values for confidentiality.

2. **Exhibit B - Doctor AI – Source Code Deposit**: 40 pages of source code excerpts showing the core algorithm (mapping, intersection, ranking modules).

3. **Exhibit C** provides a formal statement confirming that trade-secret portions of the Doctor AI database have been appropriately withheld or redacted in accordance with **37 C.F.R. § 202.20**, while ensuring full compliance with U.S. Copyright Office deposit requirements.

4. **Exhibit D** contains the sworn declaration of Dr. Azad A. Kabir, M.D., MSPH, affirming his original authorship of the Doctor AI database, detailing its development history since 2011, and confirming compliance with U.S. Copyright Office trade-secret deposit regulations.

5. **Exhibit E - Confirmatory Assignment of Copyright and Trade Secrets:** Confirms transfer of all copyrights, trade secrets, and related intellectual-property rights from Doctor AI LLC and Essential Group Publishing LLC to Dr. Azad Alamgir Kabir for registration and enforcement

---

**9. Publication Status:**

An earlier version of the software was first published around **January 20, 2012**, under the websites **theeddm.com** and **theeddm.mobi**. The system underwent multiple revisions and functional updates after that initial release. The work was later published online in limited demonstration form through **https://ddxrx.com** and **https://ddxrx.net** on **June 30, 2015**, as part of the *Doctor AI* demonstration and *ClinicalAssist* deployment. These online demonstrations provided only a functional interface for public viewing; they did **not** distribute or expose the underlying source code or the complete database, which remain **unpublished**. Internal, pre-release versions of the software date back to **Nov 13**, **2011**.

---

**10. Claimant:**

Dr. Azad Alamgir Kabir (sole owner)

Address: 1120 Beach Blvd, Biloxi, MS 39530 USA

Email: azad.kabir@ddxrx.net

Tel: (228) 342-6278

---

**11. Certification and Signature:**

I, Dr. Azad Alamgir Kabir, certify that I am the author and sole owner of the work titled **Doctor AI: Cognitive Diagnostic Reasoning Database and Source Code** and that the information provided herein is correct to the best of my knowledge.

**Signature:**

/s/ Azad Alamgir Kabir

**Dr. Azad Alamgir Kabir,**

1120 Beach Blvd

Biloxi, MS 39530

Email: azad.kabir@ddxrx.net

Tel: (228) 342-6278

**Date: November 5, 2025**

**Exhibit A: Database Schema Deposit**

**Doctor AI: Cognitive Diagnostic Reasoning Database Schema Deposit**

This document contains representative excerpts from the Doctor AI Diagnostic Database Schema. It demonstrates the relational structure and field organization for symptom–disease associations used in the system. These tables are proprietary and were constructed de novo by medical experts to encode diagnostic logic for the patented system. Each association in each Symptoms Disease Mapping table represents a verified clinical association between a symptom and a disease. Association strength (weight), prevalence, severity, and mortality risk were developed and validated by clinicians and encoded as proprietary trade secrets.

**Figure 1: Kabir Patent Figures Reproduced to Demonstrate Symptom–Disease Relationships and Intersection Logic.**

This figure illustrates the process used to curate and align data so that disease names match consistently across a database containing more than 2,000 interrelated data tables. The original data tables stored within secure servers are not displayed, as they contain proprietary information classified as trade secrets.



FIG. 2

Figure 1 (above) includes **Table 12**, which references **Chest Pain (Table 14)** and **Shortness**

**Exhibit A: Database Schema Deposit**

**of Breath (Table 22)**. These tables contain ranking data based on several proprietary weighting parameters: **Prevalence** (how commonly the condition occurs in the population), **Severity** (the degree of morbidity or disability caused by the disease), **Clinical Relevance** (how directly the disease explains the symptom profile), and **Mortality Risk** (the potential for the disease to be life-threatening). These parameters constitute confidential trade-secret information; therefore, certain data has been **redacted** from this figure.

**Figure 2: Kabir Patent Figures Reproduced to Demonstrate Intersection Logic and Rank-Ordered Differential Diagnosis Using Two Symptoms Only.**

Table 26 (within Figure 2) presents the high-probability differential diagnoses (rank order strategies are mentioned above), while Table 28 displays the low-probability differential diagnoses, representing diseases that did not match any other symptom's disease list (i.e., no intersection was found). These unmatched diseases are consequently ranked lower in the overall order of probability**.**



FIG. 3

**Exhibit A: Database Schema Deposit**

**Figure 3: Demonstration of Intersection Logic When a Third Symptom Is Added.**
The rank order shown in Table 34 is derived from the intersection logic, which depends on the strength-of-association rankings of diseases listed in Table 22. The multiple symptoms referenced in Table 10 are also ranked (as Symptom 1, Symptom 2, and Symptom 3). This chronological ordering influences the final disease ranking: the associations derived from Table 22 for the first symptom take precedence over those for the second and third symptoms. This priority system is used to break ties when multiple diseases have equal overall strength of association with the patient's symptoms.



FIG. 4

**Database Description:** The linguistic formatting of each medical term (expression) exact punctuation, spacing, capitalization, parentheses, certain and character encoding—is an original expressive feature required for Doctor AI's intersection logic to work with software programming languages like PHP, Python, and JavaScript frontend. The following excerpts demonstrate schema and naming conventions only. All symptom–disease associations were derived from clinical literature, guideline repositories, and validated expert review processes between 2011 to Present.

**Exhibit A: Database Schema Deposit**

**Example of Disease Names Inside the Database:** The name of the disease was normalized or expression of disease identifiers in the original dataset, where the name of the disease is changed, so that satisfy intersection logic (match or strength of association) can find matches of the disease name across different symptoms disease mapping databases:

"Chronic Obstructive Pulmonary Disease (COPD)" (Combining both short form and long form of name)

"Myocardial Ischemia (MI)"

"Congestive Heart Failure (CHF)"

"Graves Ophthalmopathy"

"Crohns Disease" (changing names so intersection logic complies with PHP, Python, and JavaScript programs)

"Hypertension Follow-up"

"Viral Syndrome" can be considered a variety of "Influenza" but a different name of a similar disease will fail intersection logic (unable to find a match)

"Ureteral Stone" can be considered a variety of "Kidney Stone" (same as above)

**Signature:**

**/s/ Azad Alamgir Kabir**
Dr. Azad Alamgir Kabir,
1120 Beach Blvd
Biloxi, MS 39530
Email: azad.kabir@ddxrx.net
Tel: (228) 342-6278

**Date: November 5, 2025**

**Exhibit C - Statement Regarding Trade-Secret**

**Statement Regarding Trade-Secret Portions and Compliance with U.S. Copyright Office Regulations**

The **Doctor AI Differential-Diagnosis Database** described in the accompanying application represents an original, continuously evolving clinical knowledge base first developed in 2011 and updated through 2025 (and ongoing). It encodes structured relationships between symptoms and diseases using auditable medical criteria—**prevalence, severity, clinical relevance, and mortality risk**—to generate rank-ordered differential diagnoses. The underlying datasets, numeric weightings, and association matrices constitute **confidential trade-secret information** independently developed by the author and are not publicly available in any medical text or reference.

In preparing the copyright deposit materials, all **trade-secret portions have been intentionally withheld** or **redacted** in strict compliance with **37 C.F.R. § 202.20(c)(2)(vii)** and related Copyright Office guidance. Only representative excerpts, structural schematics, and illustrative examples necessary to identify the authorship and original expression of the work are included in the public deposit. The withheld elements include specific prevalence values, severity scales, weighting coefficients, and complete database tables stored on secure servers. These redactions do not impair the Office's ability to examine originality and scope of authorship.

The deposited materials therefore, consist of:

1. **Schema-level documentation** (Exhibit A) showing the organizational logic of the database and intersection-ranking framework; and

2. **Source-code excerpts** (Exhibit B) demonstrating how that logic is algorithmically implemented.

Together these satisfy the requirements for partial deposit of a computer-program or database work while protecting proprietary data, as permitted under the Copyright Office's "Best Edition" and "Trade-Secret" provisions.

**Exhibit C - Statement Regarding Trade-Secret**

Accordingly, the applicant affirms that the deposit materials **comply fully with U.S. Copyright Office regulations**, accurately represent the authorship of the Doctor AI system, and preserve the confidentiality of underlying medical-AI trade secrets.

**Signature:**

/s/ Azad Alamgir Kabir

**Dr. Azad Alamgir Kabir,**

1120 Beach Blvd

Biloxi, MS 39530

Email: azad.kabir@ddxrx.net

Tel: (228) 342-6278

**Date: November 5, 2025**

Exhibit D – Declaration of Azad A Kabir, M.D

**DECLARATION OF AZAD ALAMGIR KABIR, M.D., MSPH REGARDING COPYRIGHT OWNERSHIP AND TRADE-SECRET COMPLIANCE**

I, **Azad Alamgir Kabir, M.D., MSPH**, hereby declare under penalty of perjury pursuant to **28 U.S.C. § 1746** that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the founder and managing member of **Doctor AI LLC**, and the original author and architect of the **Doctor AI Differential-Diagnosis Database** and related source-code materials.

2. In **November 2011**, I initiated the creation of a comprehensive medical-decision-support software system and associated database by engaging **Mr. Syed Rashid**, a software engineer, to assist with technical implementation. Mr. Rashid was initially assigned tasks related to requirements gathering so that I could subsequently design the process flow and construct the database architecture. Once the foundational specifications were outlined, I proceeded to write the initial code and implement the structural database framework.

3. To facilitate Mr. Rashid's contribution, I provided several medical textbooks and later PDF copies of advanced medical texts, with explicit instruction to extract only reference data necessary for building an original dataset organized through my proprietary statistical-mapping methodology. The project quickly expanded into a detailed, multilayered database containing complex cross-references between clinical findings (signs, symptoms, laboratory and radiologic data) and medical diagnoses.

4. Attached within **Exhibit A** are screen captures of our **2011 email correspondence**, documenting communication, file sharing, and task delegation between me and Mr. Rashid. These materials demonstrate my authorship, intellectual control, and direct oversight of the project's foundational work.

5. **Figure 1** of that correspondence confirms the initial encounter and agreement regarding the development of the **Doctor AI software**.

**Exhibit D – Declaration of Azad A Kabir, M.D**



**Fig 1: Email communication screenshot with Syed Rashid, an engineer from Bangladesh, confirming initial encounter about Doctor Ai software development**

6. Between **2013 and 2014**, I continued enhancing and refining the system. During that period, I received valuable intellectual support from my wife, **Dr. Jebun Nahar (Ph.D. in Cell and Molecular Biology)**, who, despite being on extended bed rest during a high-risk twin pregnancy, provided research guidance that improved dataset accuracy.

7. Following 2014, I expanded the database independently through rigorous review of peer-reviewed clinical guidelines, real-world diagnostic feedback, and medical literature. The current version contains more than **2,200 clinical variables** cross-referenced against **15,000 unique diagnostic entities**, forming a comprehensive system for symptom-disease mapping and ranked differential diagnosis.

8. The database encodes structured, auditable clinical criteria—including **prevalence**, **severity**, **clinical relevance**, and **mortality risk**—and employs intersection logic to produce weighted, rank-ordered differential diagnoses.

**Exhibit D – Declaration of Azad A Kabir, M.D**

9.  The materials deposited with the **U.S. Copyright Office—Exhibit A (Database Schema)**, **Exhibit B (Source Code Excerpt)**, and **Exhibit C (Trade-Secret Compliance Statement)**— were prepared in conformity with **37 C.F.R. § 202.20**.

10. Trade-secret portions such as numeric weightings, prevalence data, severity coefficients, and complete database tables have been withheld or redacted to protect confidential proprietary information while identifying the original authorship and expression of the work.

11. The Doctor AI database and its source code were **independently created** and are not copied or derived from any publication or external dataset. They constitute a unique intellectual creation and form the backbone of my patented cognitive-diagnostic system.

12. I therefore assert my **full copyright ownership** over this database, its schema, data structure, and diagnostic-mapping logic.

Any unauthorized copying, derivative use, or distribution—whether in whole or in part— constitutes a violation of my exclusive rights under **17 U.S.C. § 101 et seq.**

I declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 5th day of November 2025.**

**/s/ Azad Alamgir Kabir, M.D., MSPH**

1120 Beach Blvd, Biloxi, MS 39530

Tel: (228) 342-6278 Email: azad.kabir@ddxrx.net

**Date: 11/05/2025**

Exhibit E - Confirmatory Assignment of Copyright and Trade Secrets

**CONFIRMATORY ASSIGNMENT OF COPYRIGHT AND TRADE SECRETS**

This Confirmatory Assignment is made this 4th day of November, 2025, by and between:

**Doctor AI LLC**, a **Delaware limited liability company**, and **Essential Group Publishing LLC**, a **Mississippi limited liability company** (collectively, the "Assignors"), owned **eighty percent (80%)** by **Dr. Azad Alamgir Kabir, M.D., MSPH**, and **twenty percent (20%)** by **Dr. Jebun Nahar, Ph.D.**, and **Dr. Azad Alamgir Kabir, M.D., MSPH**, an individual residing in Biloxi, Mississippi (the "Assignee").

**RECITALS**

WHEREAS, Assignors are and have been under the management, funding, and primary direction of Dr. Kabir, who conceived, authored, and developed the *Doctor AI* database, schema, source code, algorithms, and related cognitive-AI diagnostic systems;

WHEREAS, the Assignors desire to confirm record ownership in Dr. Kabir individually of all copyrights, trade secrets, and associated intellectual-property rights created and maintained under their supervision; and

WHEREAS, Dr. Nahar, as a minority owner, acknowledges and consents to this confirmatory assignment for purposes of recording and enforcement.

**NOW, THEREFORE**, for good and valuable consideration, the sufficiency of which is acknowledged, Assignors hereby:

1. **Assign and Transfer** to **Dr. Azad Alamgir Kabir** all right, title, and interest worldwide in and to all copyrights, trade secrets, confidential know-how, and associated intellectual-property rights embodied in or derived from the *Doctor AI* database, schema, source code, ranking algorithms, and related documentation, including any updates or derivative works.

Exhibit E - Confirmatory Assignment of Copyright and Trade Secrets

2. **Confirm** that such rights have at all times been beneficially owned and controlled by Dr. Kabir and that this instrument serves solely as a formal recordation of that ownership.

3. **Authorize** Dr. Kabir to register, enforce, and defend these rights in his individual capacity before the **U.S. Copyright Office**, **U.S. Patent and Trademark Office**, or any other court or agency.

IN WITNESS WHEREOF, the parties have executed this Confirmatory Assignment as of the date first written above.

**Doctor AI LLC (Delaware)**

By: _____

Name: **Dr. Azad Alamgir Kabir**

Title: **Managing Member**

**Essential Group Publishing LLC (Mississippi)**

By: _____

Name: **Dr. Azad Alamgir Kabir**

Title: **Managing Member**

**Acknowledged and Consented:**

_____

**Dr. Jebun Nahar, Ph.D.**

**Assignee:**

_____

**Dr. Azad Alamgir Kabir, M.D., MSPH**

**Exhibit E - Confirmatory Assignment of Copyright and Trade Secrets**

**NOTARY ACKNOWLEDGMENT**

**State of** _ALABAMA_

**County of** _MONTGOMERY_

On this _4th_ day of _November_, 2025, before me, the undersigned Notary Public, personally appeared **Dr. Azad Alamgir Kabir, M.D., MSPH**, 1120 Beach Blvd, Biloxi, MS 39530 and **Dr. Jebun Nahar, Ph.D.**, 1120 Beach Blvd, Biloxi, MS 39530, known to me (or satisfactorily proven) to be the persons whose names are subscribed to the foregoing instrument, and acknowledged that they executed the same for the purposes therein contained, in their respective capacities as set forth above.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

Signature of Notary Public: _____

Printed Name of Notary Public: _CEDRIC BOLLING_

My Commission Expires: _10/31/2026_

[Notary Seal]



**DECLARATION OF DR. AZAD A. KABIR**

I, **Dr. Azad A. Kabir**, hereby declare as follows:

1. I am the inventor of U.S. Patent No. 11,972,865 B1 and related continuation applications. I hold a Master of Science in Public Health (Biostatistics) from **Tulane University School of Public Health and Tropical Medicine** and am board-certified in Internal Medicine. I have more than twenty years of combined experience in clinical medicine, statistical modeling, and the development of computer-assisted diagnostic and decision-support systems. The statements in this declaration are based on my education, training, and professional experience, and if called as a witness, I could and would testify competently thereto.

2. Based on my education, training, and professional experience, I declare that there exists **no alternative scientific or computational method** for analyzing nominal (name-based) data—such as symptoms and diseases—when diagnostic reasoning is derived from open-ended or unbounded clinical inputs. In the absence of fixed rules, such as those in a decision-tree model, any system that performs differential diagnosis must inherently rely on **symptom–disease mapping** and **intersection-based computation** to determine the strength of association among possible conditions.

3. A system like OpenAI GPT 5 model that accepts **multiple random symptoms in any combination** and attempts to deliver a **rank-ordered differential diagnosis** can function only by employing such patented mapping and intersection logic.

4.  The only conceivable alternative approach is through **natural-language-processing (NLP)** models, or ChatGPT prior models (GPT 1-3), which merely generate unstructured textual output—essentially **linguistic "word salads" lacking any meaningful or reproducible ranking** of the derived differential diagnoses. Such AI models' production does not perform structured reasoning or quantify diagnostic probability and therefore cannot replace or reproduce the patented computational framework.

5.  Another alternative process is the **decision-tree model**, which represents WebMD's **pre-2018 diagnostic architecture** before the company transitioned to the **Kabir patented model**. The decision-tree approach is a **rigid, rule-based system** that generates differential diagnoses only through fixed, sequential questioning. Such systems cannot accept or process **random combinations of symptoms**, as each step is constrained by predetermined branching logic. This limitation characterizes both **WebMD's pre-2018 system** and earlier medical reasoning engines such as **DxPlain**, distinguishing them from the Kabir invention, which uniquely allows unstructured symptom inputs and dynamically computes ranked differential diagnoses based on intersection logic and weighted parameters.

6.  Accordingly, any **computer-implemented system** that maps symptoms to diseases and computes intersections to generate a **rank-ordered differential diagnosis** necessarily practices the patented method. No other algorithmic pathway can perform this reasoning without applying the structured, frequency-based association logic and prevalence weighting claimed in the Kabir patent.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7th day of November 2025.

/s/ Azad Kabir
**Azad A. Kabir, M.B.B.S., M.S.P.H.**
Inventor, U.S. Patent No. 11,972,865 B1
1120 Beach Blvd
Biloxi, MS 39530
Email: azad.kabir@ddxrx.net
Tel: (228) 342-6278

EXHIBIT C

## EMPLOYEE INTELLECTUAL PROPERTY AND INVENTIONS ASSIGNMENT AGREEMENT (INCLUDING NONDISCLOSURE)

This employee intellectual property and inventions assignment agreement (including nondisclosure) is between Syed Fakrur Rashid, an individual (the "**Employee**") and The Essential Group Publishing, LLC (the "**Company**")

IN CONSIDERATION of the Employee's employment with the Company and the compensation that will be paid for that employment, the parties agree as follows:

### 1.  CONFIDENTIAL INFORMATION.

In conjunction with the Employee's employment, the Company may (but is not required to) disclose to the Employee, or the Employee may develop or learn, confidential information. "**Confidential Information**" means:

   **(a)** any Company intellectual property, information, or trade secrets (whether or not specifically labeled or identified as confidential), whether provided orally, in writing, or by any other media, that was or will be disclosed to, developed, or learned by the Employee, and that relates to the business, products, services, research, or development of or by the Company or its suppliers, distributors, investors, partners, and other business associates, and that has not become publicly known. Confidential Information includes:

    (i)   internal business information (including information relating to strategy, staffing, business, financial data, training, marketing, promotional and sales plans and practices, costs, bidding activities and strategies, rate and pricing structures, and accounting and business methods);

    (ii)   identities of, negotiations with, individual requirements of, specific contractual arrangements with, and information about the Company's suppliers, distributors, customers, investors, partners, and other business associates, their contact information, and their confidential information;

    (iii)   manufacturing parameters, material specifications, design specifications, design processes, technical drawings, prototypes, testing procedures and technical data, specific program information, trade or industrial practices, engineering practices and methods, techniques, computer programs, formulae, systems, research, records, reports, manuals, documentation, customer and supply lists, data and databases relating to those, and technology and methodology regarding specific projects; and

    (iv)   inventions, whether or not patentable, original works of authorship, trade secrets, know how, other intangible property protectable under federal, state, or foreign law that is not generally available to the public or published by the Company, other information concerning the Company's or its customers' actual or anticipated products or services, business, research, or development, or any information that is received in confidence by

EXHIBIT C

or for the Company from any other person, and any other information that was or will be developed, created, or discovered by or on behalf of the Company, or that became or will become known by, or was or is conveyed to the Company, that has commercial value in the Company's business ("**Intellectual Property**"); and

**(b)** all notes, analyses, compilations, studies, summaries, and other material, whether provided orally, in writing, or by any other media, that contain or are based on all or part of the information described in subsection (a) (the "**Derivative Materials**").

## 2. OBLIGATION TO MAINTAIN CONFIDENTIALITY.

**(a)**          **Confidentiality.** At all times during his employment, the Employee shall hold in strictest confidence, and not use, except for the benefit of the Company, or to disclose to any person, firm, or corporation without the prior written authorization of the Board of Directors of the Company, any of the Company's Confidential Information.

**(b)**          **Term.** The Employee shall maintain the confidentiality and security of the Confidential Information until the earlier of: (i) such time as all Confidential Information disclosed under this agreement becomes publicly known and is made generally available through no action or inaction of the Employee or (ii) the third anniversary of the termination of the Employee's employment. However, to the extent that the Company has disclosed information to the Employee that constitutes a trade secret under law, the Employee shall protect that trade secret for as long as the information qualifies as a trade secret.

## 3. EXCLUSIONS.

The obligations and restrictions of this agreement do not apply to that part of the Confidential Information that the Employee demonstrates:

**(a)** was or becomes generally publically available other than as a result of a disclosure by the Employee in violation of this agreement;

**(b)**          was or becomes available to the Employee on a nonconfidential basis before its disclosure to the Employee by the Company or a Company Representative, but only if:

  (i)   the source of such information is not bound by a confidentiality agreement with the Company or is not otherwise prohibited from transmitting the information to the Employee by a contractual, legal, fiduciary, or other obligation; and

  (ii)  the Employee provides the Company with written notice of such prior possession either (A) before the execution and delivery of this agreement or (B) if the Employee later becomes aware (through disclosure to the Employee) of any aspect of the Confidential Information as to which the Employee had prior possession, promptly on the Employee so becoming aware; or

EXHIBIT C

(c)                     is requested or legally compelled (by oral questions, interrogatories, requests for information or documents, subpoena, civil or criminal investigative demand, or similar process), or is required by a regulatory body, to be disclosed. However, the Employee shall:

  (i)   provide the Company with prompt notice of any such request or requirement before disclosure so that the Company may seek an appropriate protective order or other appropriate remedy; and

  (ii)  provide reasonable assistance to the Company in obtaining any such protective order.

If a protective order or other remedy is not obtained or the Company grants a waiver under this agreement, then the Employee may furnish that portion (and only that portion) of the Confidential Information that, in the written opinion of counsel reasonably acceptable to the Company, the Employee is legally compelled or otherwise required to disclose. The Employee shall make reasonable efforts to obtain reliable assurance that confidential treatment will be accorded any part of the Confidential Information so disclosed.

4. **INVENTIONS.**

(a) **Inventions Retained and Licensed.** Attached as **Exhibit A** to this agreement is a list of all Intellectual Property that the Employee made before his employment with the Company (the "**Prior Inventions**") that belong to the Employee, that relate to the Company's proposed business, products, or research and development, and that are *not* assigned to the Company under this agreement. If no such list is attached, the Employee represents that there are no Prior Inventions. If disclosure of any such Prior Invention would cause the Employee to violate a prior confidentiality agreement, the Employee will not list the Prior Invention in **Exhibit A** but will provide a name of the invention, a list of the party or parties it belongs to, and the explanation why full disclosure was not given. A space is provided in **Exhibit A** for this purpose. If in the course of employment with the Company, the Employee incorporates into a Company product, process, or machine a Prior Invention owned by the Employee or in which the Employee has an interest, the Company will be granted and have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license to make, have made, modify, use, and sell such Prior Invention as part of or in connection with such product, process, or machine.

(b) **Assignment of Intellectual Property and Inventions.** The Employee shall disclose promptly in writing to the Company all Intellectual Property that the Employee has authored, made, conceived, or first actually reduced to practice, alone or jointly with others:

  (i)   while the Employee is or was performing duties for the Company;

  (ii)  during the Employee's employment with the Company, if it relates to the Company's areas of business or investigations;

EXHIBIT C

(iii)    that results from or is suggested by any work that the Employee does for the Company or at the Company's request; or

(iv)    that was aided by the Employee's use of the Company's equipment, supplies, facilities, or trade secret information, whether or not during working hours.

This Employee-created Intellectual Property is referred to in this agreement as "**Inventions**."

The Employee acknowledges that any Invention the Employee makes within the scope of and during his employment with the Company and that is protectable by copyright is a "work made for hire," as that term is defined in the United States Copyright Act.

In addition, all Intellectual Property and all title, patents, patent rights, copyrights, trade secret rights, and other intellectual property and rights anywhere in the world (collectively, the "**Rights**") connected to those will be the sole property of the Company. The Employee hereby assigns to the Company any Rights his may have or acquire in any Intellectual Property.

**(c) Maintenance of Records.** The Employee shall keep and maintain adequate and current written records of all Inventions the Employee makes (solely or jointly with others) during the term of employment with the Company. The records may be in the form of notes, sketches, drawings, and any other format specified by the Company. The records will be available to and remain the sole property of the Company at all times.

**(d) Patent and Copyright Registrations.** The Employee shall help the Company or its designee, at the Company's expense, secure the Company's rights in the Inventions and any copyrights, patents, mask work rights, or other intellectual property rights relating to the Inventions in all countries, including by disclosing to the Company all pertinent information and data about any of those, by signing all applications, specifications, oaths, assignments, and all other instruments that the Company may deem necessary to apply for and obtain such rights and to assign and convey to the Company, its successors, assigns, and nominees the exclusive interest in those Inventions, and any copyrights, patents, mask work rights, or other intellectual property rights relating to those. When it is in the Employee's power to do so, his obligation to sign or cause to be signed any such instrument or papers will continue after the termination of this agreement. If because of the Employee's mental or physical incapacity or for any other reason the Company is unable to secure a signature to apply for or pursue any application of any United States or foreign patents or copyright registrations covering Inventions or original works of authorship assigned to the Company as above, the Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as the Employee's agents and attorneys in fact, to act for and on behalf of the Employee to sign and file those applications and do all other lawfully permitted acts to further the prosecution and issuance of patent or copyright registrations on them with the same legal force and effect as if signed by the Employee.

EXHIBIT C

## 5.  RETURN OF PROPERTY.

[On the termination of the Employee's employment with the Company] [At the Company's request], the Employee shall promptly (and no later than 7 days after the request):

(a)                      return all Confidential Information to the Company; and

(b)                      destroy all Derivative Material and within 7 days of this destruction, provide a written certificate to the Company confirming this destruction.

If his employment is terminated or the Company so requests, the Employee shall sign and deliver to the Company the certification attached as **Exhibit B**.

## 6.  THIRD-PARTY INFORMATION.

The Employee recognizes that the Company has received and in the future will receive confidential or proprietary information from third parties, subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the term of his employment and afterwards, the Employee owes the Company and such third parties a duty to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm, or corporation except as necessary in carrying out the Employee's work for the Company (consistent with the Company's agreement with such third party) or to use it for the benefit of anyone other than the Company or such third party (consistent with the Company's agreement with such third party) without the prior written consent of the Company. Any such information will be considered Confidential Information for purposes of this agreement.

## 7.  FORMER EMPLOYER OR THIRD PARTY CONFIDENTIAL INFORMATION.

The Employee understands that it is the Company's policy to maintain the rights of any party with which the Employee has a confidentiality or proprietary rights agreement. During his employment with the Company, the Employee may not improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity or bring onto the premises of the Company any unpublished document or proprietary information belonging to that employer, person, or entity unless the employer, person, or entity consents in writing. The Employee has no existing obligations to others that are inconsistent with any of the provisions in this agreement, except for those identified on **Exhibit C**.

## 8.  NOTIFICATIONS.

The Employee hereby authorizes the Company to notify others, including customers of the Company and any future or prospective employers of the Employee, of the terms of this agreement and each party's rights and obligations in it.

## 9.  OWNERSHIP RIGHTS.

EXHIBIT C

The Employee acknowledges that the Confidential Information is and will be the Company's sole property, even if suggestions made by the Employee are incorporated into the Confidential Information. The Employee obtains no rights by license or otherwise in the Confidential Information under this agreement. The Employee may not use the Confidential Information as a basis on which to develop or have a third party develop a competing or similar undertaking.

## 10. CHOICE OF LAW; ATTORNEYS' FEES; EQUITABLE RELIEF.

(a) **Choice of Law.** The laws of the state of Mississippi govern this agreement (without giving effect to its conflicts of law principles).

(b) **Choice of Forum.** Both parties consent to the personal jurisdiction of the state and federal courts in Mississippi.

(c) **Attorneys' Fees.** If either party employs attorneys to enforce any rights arising out of or relating to this agreement, the losing party shall reimburse the prevailing party for its reasonable attorneys' fees and costs.

(d) **Equitable Relief.** The Employee's breach of this agreement will cause irreparable harm to the Company and monetary damages may not be a sufficient remedy for an unauthorized disclosure of the Confidential Information. If the Employee discloses the Confidential Information in violation of this agreement, the Company may, without waiving any other rights or remedies and without posting a bond or other security, seek an injunction, specific performance, or other equitable remedy to prevent competition or further disclosure, and may pursue other legal remedies.

## 11. AMENDMENTS.

No amendment to this agreement will be effective unless it is in writing and signed by a party or its authorized representative.

## 12. ASSIGNMENT AND DELEGATION.

(a) **No Assignment.** The Employee may not assign any of his rights under this agreement, except with the prior written consent of the Company, which consent may not be unreasonably withheld. All voluntary assignments of rights are limited by this subsection.

(b) **No Delegation.** The Employee may not delegate any performance under this agreement, except with the prior written consent of the Company, which consent may not be unreasonably withheld.

(c) **Enforceability of an Assignment or Delegation.** If a purported assignment or purported delegation is made in violation of this section 12, it is void.

## 13. COUNTERPARTS; ELECTRONIC SIGNATURES.

EXHIBIT C

(a) **Counterparts.** The parties may execute this agreement in any number of counterparts, each of which is an original but all of which constitute one and the same instrument.

(b) **Electronic Signatures.** This agreement, agreements ancillary to this agreement, and related documents entered into in connection with this agreement are signed when a party's signature is delivered by facsimile, email, or other electronic medium. These signatures must be treated in all respects as having the same force and effect as original signatures.

## 14. SEVERABILITY.

If any provision in this agreement is, for any reason, held to be invalid, illegal, or unenforceable in any respect, that invalidity, illegality, or unenforceability will not affect any other provisions of this agreement, but this agreement will be construed as if the invalid, illegal, or unenforceable provisions had never been contained in this agreement, unless the deletion of those provisions would result in such a material change that would cause completion of the transactions contemplated by this agreement to be unreasonable.

## 15. NOTICES.

(a) **Writing; Permitted Delivery Methods.** Each party giving or making any notice, request, demand, or other communication required or permitted by this agreement shall give that notice in writing and use one of the following types of delivery, each of which is a writing for purposes of this agreement: personal delivery, mail (registered or certified mail, postage prepaid, return-receipt requested), nationally recognized overnight courier (fees prepaid), facsimile, or email.

(b) **Addresses.** A party shall address notices under this section 15 to a party at the following addresses:

If to the Company:
Azad Kabir; CEO; The Essential Group Publishing, LLC
1120 Beach Blvd
Biloxi; MS 39530
Cell: 228-342-6278
Email Address: azad.kabir@gmail.com

If to the Employee:
Syed Fakrur Rashid
Email Address: fakrur@squaregroup.com

(c) **Effectiveness.** A notice is effective only if the party giving notice complies with subsections (a) and (b) and if the recipient receives the notice.

## 16. WAIVER.

EXHIBIT C

No waiver of a breach, failure of any condition, or any right or remedy contained in or granted by the provisions of this agreement will be effective unless it is in writing and signed by the party waiving the breach, failure, right, or remedy. No waiver of any breach, failure, right, or remedy will be deemed a waiver of any other breach, failure, right, or remedy, whether or not similar, and no waiver will constitute a continuing waiver, unless the writing so specifies.

## 17. ENTIRE AGREEMENT.

This agreement constitutes the final agreement of the parties. It is the complete and exclusive expression of the parties' agreement with respect to the subject matter of this agreement. All prior and contemporaneous communications, negotiations, and agreements between the parties relating to the subject matter of this agreement are expressly merged into and superseded by this agreement. The provisions of this agreement may not be explained, supplemented, or qualified by evidence of trade usage or a prior course of dealings. Neither party was induced to enter this agreement by, and neither party is relying on, any statement, representation, warranty, or agreement of the other party except those set forth expressly in this agreement. Except as set forth expressly in this agreement, there are no conditions precedent to this agreement's effectiveness.

## 18. HEADINGS.

The descriptive headings of the sections and subsections of this agreement are for convenience only, and do not affect this agreement's construction or interpretation.

## 19. EFFECTIVENESS.

This agreement will become effective when all parties have signed it. The date this agreement is signed by the last party to sign it (as indicated by the date associated with that party's signature) will be deemed the date of this agreement.

## 20. NECESSARY ACTS; FURTHER ASSURANCES.

The Employee, the Company, and the Company's officers and directors shall use all reasonable efforts to take, or cause to be taken, all actions necessary or desirable to consummate and make effective the transactions this agreement contemplates or to evidence or carry out the intent and purposes of this agreement.

[SIGNATURE PAGE FOLLOWS]

Each party is signing this agreement on the date stated opposite that party's signature.

The Essential Group Publishing

Date: 08/17/2014

By: _Azad Kabir_

Name: Azad A Kabir, MD MSPH
Title: Chief Executive Officer, The Essential Group
Publishing LLC

Date: 17·08·14

By: _____

Name: Syed Fakrur Rashid

The parties acknowledge and agree that this Agreement shall be effective as of November 1, 2011, and shall apply to all Confidential Information disclosed from that date forward."

By ------------------------------
Name: Azad A. Kabir

By ------------------------------
Name: Syed Fakrur Rashid

EXHIBIT A

## LIST OF PRIOR INVENTIONS AND ORIGINAL WORKS OF AUTHORSHIP

1.  Except as listed in section 2 below, the following is a complete list of all Prior Inventions that were made, conceived, or first reduced to practice by the Employee, alone or jointly with others, before his employment by the Company:

| Title | Date | Identifying Number or Brief Description |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

I have no inventions or improvements to list.

_____ (Initials)

I have attached _____ additional sheets to this Exhibit A.

**The parties acknowledge and agree that this Agreement shall be effective as of November 1, 2011, and shall apply to all Confidential Information disclosed from that date forward."**

2.  Because of an existing confidentiality agreement and the duties of confidentiality that the Employee owes to the parties listed below, the Employee cannot complete the disclosure in Section 1 above with respect to the inventions or improvements listed generally below:

| Invention or Improvement | Party Names | Relationship |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

EXHIBIT A

I have attached _____ additional sheets to this Exhibit A.

(Initials)

Date: _____ 17·08·14

By: _____

Name: Syed Fakrur Rashid

The parties acknowledge and agree that this Agreement shall be effective as of November 1, 2011, and shall apply to all Confidential Information disclosed from that date forward."

By ----------------------------------
Name: Syed Fakrur Rashid

EXHIBIT B

## CERTIFICATION

This is to certify that I do not have in my possession, and I have not failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any of these items, belonging to The Essential Group Publishing, LLC, its subsidiaries, affiliates, successors, or assigns (the "Company").

I further certify that I have complied with the terms of the employee intellectual property rights and nondisclosure agreement signed by me, including the reporting of any inventions and original works of authorship (as defined in the agreement), conceived or made by me (solely or jointly with others) covered by that agreement.

I further agree that, in compliance with the employee intellectual property rights and nondisclosure agreement, I will preserve as confidential all trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

Date: _____ 17 08 14

By: _____

Name: Syed Fakrur Rashid


The parties acknowledge and agree that this Agreement shall be effective as of November 1, 2011, and shall apply to all Confidential Information disclosed from that date forward."

By ------------------------------------
Name: Syed Fakrur Rashid

EXHIBIT C

## LIST OF PRIOR CONFIDENTIALITY OBLIGATIONS

| Date of Agreement or Obligation | Parties' Names | Brief Description |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

I have no prior confidentiality obligations.                                    (Initials)

I have attached _____ additional sheets to this Exhibit C.                       (Initials)

Date:    17·08·14

By:    _____

Name: Syed Fakrur Rashid

The parties acknowledge and agree that this Agreement shall be effective as of November 1, 2011, and shall apply to all Confidential Information disclosed from that date forward."

By --------------------------------

Name: Syed Fakrur Rashid